LINDEN LAND COMPANY and another, Respondents, vs. THE MILWAUKEE ELECTRIC RAILWAY & LIGHT COMPANY, imp., Appellant.

*September 11 — October 12, 1900.*

(1) *Appeal: Intermediate orders, when reviewed.* (2) *Denial of leave to discontinue action: Jurisdiction.* (3–14) *Taxpayer's action: Street railroads: Franchises: Discretion of common council: Parties: Pleadings: Surplusage: Injunction: Motion to vacate: Abutters: Compensation: Constitutional law: Statutes: Reasonableness of extension of franchise: Review of ordinance granting franchises at suit of private parties.*

1. There is no provision of statute which authorizes a review of one intermediate order upon an appeal from another. Sec. 3070, Stats. 1898, provides for review of intermediate orders involving and necessarily affecting the judgment, on appeal from the judgment.

2. The circuit court has jurisdiction to refuse to allow a plaintiff to arbitrarily discontinue his action, and also jurisdiction to allow another plaintiff to be substituted in his place. *State ex rel. Milwaukee v. Ludwig*, 106 Wis. 226, followed.

3. A taxpayer cannot maintain an action to revise, control, or vacate the acts of a municipal government, except as incidental or subsidiary to the protection of some private right or prevention of some private wrong, or to prevent any wrongful squandering or surrender of the moneys, property, or property rights of the municipality, or when unlawful increase in the burdens of taxation is threatened by the proposed action.

4. By sec. 1862, Stats. 1898 (providing for the formation, etc., of street railway corporations), the city is empowered to grant the use of streets and bridges to such corporations *upon such terms as the proper authorities shall determine.* A city, acting under such statute, granted the defendant street railway company a franchise to extend its lines, then in operation, on certain designated streets, without receiving any money consideration therefor, but in consideration that the company should charge a reduced fare. The company had formerly offered a large sum of money for such franchise, with the right to charge the former fare; and other parties had offered a large sum of money for the additional franchise, but they owned no connecting lines. *Held*, that the granting of the franchise was a question addressed to the sound discretion of the common council; and that when it decided that the reduced fares

Linden Land Co. and another vs. Milwaukee Electric Ry. & Light Co.

were more desirable for the public, while it may or may not have exercised good discretion, such action cannot be called, in any proper or reasonable sense, a squandering of public funds or property.

5. Under sec. 2604, Stats. 1898, authorizing one to sue for the benefit of all where the question is one "of common or general interest of many persons," two or more owners in severalty of abutting lots similarly situated *may* join as plaintiffs, in an action to prevent the laying of a street railway, about to be laid upon a street without authority of law, on the ground that it will be a continuing nuisance to the owners of abutting lots, but one cannot sue for the benefit of all; and a statement in the complaint that he does so sue is mere surplusage.

6. A motion to vacate a preliminary injunction is properly denied, where it appears from the complaint and the papers used upon such motion, that either or any of the plaintiffs was legally entitled to have the injunctional order maintained pending the action.

7. The true object of a preliminary injunctional order, both at common law and under the statute (sec. 2774, Stats. 1898), is to prevent the commission of some act, "the commission or continuance of which during the litigation would produce injury to the plaintiff." The extent of the necessity marks the extent of the right to enjoin.

8. The owner of property abutting on a street in which it is proposed to construct a street railway under a franchise, conditioned that it should be accepted by the railway company, even though he might be entitled to enjoin the construction of the railway in front of his lot, cannot enjoin the company from accepting the franchise, and thus in effect annul the entire grant.

9. In such case the owner of property abutting on one street cannot enjoin the construction of such street railway on another, a mile and a half distant, and on which he owns no property.

10. The laying and operation of an electric street railway for the carriage of passengers only, to be operated by the overhead system with trolley wires and supporting poles, under an ordinance permitting the same to be done, in the absence of a showing that it is proposed to locate poles or structures in such manner as to interfere with a property owner's right of access to his property, can be done without making compensation to the adjoining lot owners, and is not an additional burden to the fee. *La Crosse City R. Co. v. Higbee, ante,* p. 389, followed.

11. Sec. 1862, Stats. 1898, authorizing the formation of street railway corporations, and the granting to them, by municipal corporations, of the use of streets for the carriage of *freight* and passengers, is

not unconstitutional, in that it makes such railway a commercial railway and nowhere provides for the payment of compensation to the abutting owner: the statute is intended to authorize corporations to use streets, with the consent of the city. for carriage of freight *as against the rights* of the public only, not.as against private owners, who are left in full possession of their rights to stop the construction, insist on compensation, or give their consent, as they chose.

12. While franchises permitting street railway corporations to use and occupy city streets are legislative grants, in that in granting them the common council is exercising legislative power delegated to it by the state, they are not grants of "corporate powers or privileges" within sec. 31, art. IV, Const., prohibiting the enacting of any special or private law granting corporate powers or privileges. They are not franchises essential to corporate existence, and granted as part of the organic act of incorporation, but are such as may be sold and assigned, if assignable, or lost by forfeiture, and yet not thereby affect the corporate existence of the street railway.

13. Under sec. 1862, Stats. 1898, giving the municipality power to grant to street railway companies the use of streets, without limitation, save that such grant be made "upon such terms as the proper authorities shall determine," the common council thereof has power to extend existing franchises of such corporations, which would expire in 1924 and succeeding years, to 1934, and such extension.of time is not unreasonable.

14. Objection to the regularity of the proceedings of the common council in adopting an ordinance granting to a street railway corporation the streets of the city, in that the provisions of sec. 940*b*, Stats. 1898, requiring publication of the application therefor in the official paper for not less than two weeks, reference to appropriate committees, and report therefrom before action, were not complied with; and objection to such ordinance in that its officers used corrupt methods in securing passage of such ordinance by agreeing to pay large sums to citizens in order to induce them to cease opposition to its passage,— it not being charged that any member of the council was corrupted,— cannot be raised at the suit of private parties.

APPEAL from orders of the superior court of Milwaukee county: J. C. LUDWIG, Judge. *Reversed.*

On the 2d of January, 1900, the common council of the city of Milwaukee passed an ordinance and a resolution in

Linden Land Co. and another vs. Milwaukee Electric Ry. & Light Co.

identical terms, each of which purported to grant to the defendant railway company the right to operate street railways upon certain streets in said city, and also purported to renew and extend all the existing railway franchises already owned by the railway company upon other streets in said city, and requiring said defendant railway company to file a written acceptance of the grants so made within thirty days. On the 5th of January, 1900, one J. G. Trentlage commenced this action in equity against the railway company and the city for the purpose of restraining the railway company from filing its acceptance of said grants, and restraining the city officers from receiving such acceptance, and preventing the railway company from laying street railway tracks and operating a street railway upon First avenue, in said city; the same being one of the streets covered by the grant.

The complaint alleged, in substance, that Trentlage was a citizen and taxpayer of the city of Milwaukee, and owned two lots on said First avenue, and brought the action in his own behalf and in behalf of all other taxpayers and owners of property in said city similarly situated, being many thousands in number; that the defendant railway company was a corporation authorized by its charter to carry freight and passengers by any kind of power as a common carrier, and owned, or claimed to own, certain licenses or rights under ordinances of the city to use a large part of the streets of the city for street railway purposes for limited periods of time, which had not yet expired, and which streets did not include First avenue and a number of streets specifically named. The complaint then proceeded to allege certain facts which constituted the grants attempted to be made by the ordinance and resolution of January 2d illegal and void. These allegations were, in substance, to the following effect: That a scheme or plan had been entered into by the mayor and certain members of the common council with the offi-

cers of the defendant railway company to extend the existing franchises of the company, and fix the rates of compensation to be charged by the company, and also to grant the right to use all the principal streets of the city for street railway purposes, for the purpose of preventing the common council of the city in the future from regulating rates of fare, or taking any action in respect to the granting of new franchises or the extension of existing franchises, and the fixing of the rate of fare for the carriage of passengers; that said franchises and privileges were of great value, and that large amounts of money had been offered for them, but that the same had been improvidently given away by the city, by virtue of said ordinance and resolution, without any remuneration, and that the city had no right or power to grant the same without consideration; that the money which the city might and could obtain for the franchise was thereby lost to the city, and that the city's expenses in the care and widening of the streets and viaducts thereby granted would be greatly increased, and the burdens of the taxpayers in said city correspondingly increased; that the defendant company proposed to operate its cars by the overhead electric system, and erect poles and wires in the streets, carrying both freight and passengers, and that no provision had been made for compensation to the plaintiff and other abutting owners, and that the defendant company threatened and intended to enter upon First avenue and upon the plaintiff's premises without compensation, and operate its railway upon said street; that the defendant railway company has already issued a mortgage and bonds upon all its acquired franchises, including those mentioned in this action, and intends to still further issue bonds thereon which will become a lien thereon in the hands of innocent purchasers; and that the plaintiff and other taxpayers will be remediless.

The complaint also alleges that there were illegal and im-

proper means employed by the officers of the railroad company to secure said grant, in that the said officers agreed to pay about $8,000 to various citizens for the purpose of silencing their opposition to said ordinance; that the ordinance in question was invalid, because not referred to a committee before action thereon by the common council, and because the action of the common council was not preceded by the report of a committee thereon, as required by the city charter; that said ordinance was invalid because no notice of the application for the grant had been published as required by sec. 940*b*, Stats. 1898. It was also alleged that the plaintiff had no adequate remedy at law.

' Upon these allegations the plaintiff prayed that the defendant railway company be enjoined from accepting said ordinance and resolution, and that the grant of the common council be set aside and annulled, as a cloud on the plaintiff's title, and that the plaintiff have such other order or judgment as might be equitable.

Upon this complaint a preliminary injunctional order was obtained, enjoining the company from accepting said grant, and the officers of the city from receiving any acceptance thereof, and also enjoining the company from building its railway on any part of First avenue.

Immediately upon the service of the complaint and injunctional order, the defendant company moved upon the complaint to vacate the injunctional order, which motion was denied on the 29th of January, 1900. Upon the same day the plaintiff Trentlage came into court and filed a notice of discontinuance of the action, and attempted to move the court to dismiss the action; but said motion was not passed upon until the following day, when the *Linden Land Company*, a corporation which owns certain real estate fronting upon Locust street, one and one-half miles distant from Trentlage's lots upon First avenue, came into court and made a petition asking to be substituted as plaintiff in the

action, whereupon the court refused to dismiss the action,
but allowed Trentlage to withdraw as plaintiff, and substi-
tuted the *Linden Land Company* in his place as plaintiff,
and allowed the new plaintiff time in which to frame and
file a new complaint. On the 29th of March, 1900, the sub-
stituted plaintiff filed a new complaint, and upon the 6th of
April following one *Charles J. Eigel*, who owns a lot upon
First avenue some distance from Trentlage's property, made
petition to the court, asking to be joined as plaintiff with
the *Linden Land Company*, which petition was granted
April 7, 1900, against the defendant's objection.

The amended complaint of the *Linden Land Company*
alleged its ownership of lots abutting on Locust street, one
of the streets mentioned in the grant, and also alleged that
it was a taxpayer, and maintained this action in behalf of
all taxpayers and abutting owners similarly situated. It
charges that the defendant railway company is an ordi-
nary commercial railway, carrying passengers and freight.
It set forth with particularity the previous grants of said
railway franchises which had been made to different corpo-
rations, and which had been purchased by the defendant rail-
way company, and had not yet expired. It then charged
substantially the same illegalities in the ordinance attacked
which were charged in Trentlage's complaint,— going, how-
ever, more into details; and the prayer for judgment con-
tains a specific demand that the defendant be enjoined from
entering on any part of the premises of the plaintiff, or other
taxpayers and abutting owners in whose behalf the suit is
brought. After the service of this complaint, the defendant
railway company answered, putting in issue most of the
allegations of the complaint.

Upon this answer and certain affidavits the defendant made
a second motion to dissolve the injunctional order, which
was heard and denied on the 9th day of June, 1900. From
the order of January 29th refusing to vacate the preliminary

Linden Land Co. and another vs. Milwaukee Electric Ry. & Light Co.

injunctional order, and from the order of June 9th to the same effect, the defendant railway company appeals.

For the appellant there was a brief by *Miller, Noyes, Miller & Wahl*, attorneys, and a separate brief by *Charles Quarles*, of counsel, and oral argument by *Mr. George P. Miller* and *Mr. Quarles.*

For the respondents there was a brief by *Timlin, Glicksman & Conway* and *Toohey & Gilmore*, and oral argument by *W. H. Timlin* and *John Toohey*. They contended, *inter alia*, that the ordinance in question was unconstitutional. *Chicago & N. W. R. Co. v. M., R. & K. E. R. Co.* 95 Wis. 572; *State ex rel. Att'y Gen. v. Dayton T. Co.* 7 Ohio Legal News, 218; *Sherman v. M., L. S. & W. R. Co.* 40 Wis. 645; *Shepardson v. M. & B. R. Co.* 6 Wis. 605; *Newell v. Smith*, 15 Wis. 101; *Bigelow v. W. W. R. Co.* 27 Wis. 486; *Chicago & N. W. R. Co. v. O., A. & B. W. R. Co.*, ante, p. 192; *Connecticut River R. Co. v. Comm'rs of Franklin*, 127 Mass. 50; *Neponset M. Co. v. Tileston*, 133 Mass. 189; *State v. Perth Amboy*, 52 N. J. Law, 132; *State v. C., M. & St. P. R. Co.* 36 Minn. 402; *Brewer v. Bowman*, 9 Ga. 37; *Foster v. Stafford Nat. Bank*, 57 Vt. 128; *Bloodgood v. M. & H. R. R. Co.* 18 Wend. 9; *People ex rel. Harvey v. Loew*, 102 N. Y. 471; *Williams v. N. Y. C. R. Co.* 16 N. Y. 97; Cooley, Const. Lim. (5th ed.), 693, 679 note 2, 705; Randolph, Eminent Domain, § 229. Said ordinance and sec. 1862, Stats. 1898, were unconstitutional under sec. 1, art. II, and secs. 31, 32, art. IV, Const. Morawetz, Priv. Corp. (2d ed.), § 12; *Stevens Point B. Co. v. Reilly*, 44 Wis. 295; 4 Thomp. Corp. § 5342; *Adams v. Beloit*, 105 Wis. 363; *Pennsylvania R. R. v. Montgomery Co. Pass. Ry.* 167 Pa. St. 62; *Sims v. Street R. Co.* 37 Ohio St. 556; *Chicago C. R. Co. v. People ex rel. Story*, 73 Ill. 547; *Belleville v. Citizens' H. R. Co.* 152 Ill. 171; *School Dist. v. Ins. Co.* 103 U. S. 707; *State ex rel. Att'y Gen. v. Madison St. R. Co.* 72 Wis. 612; *State ex rel. Cream City R. Co. v. Hilbert*, 72 Wis. 184; *State ex rel. Milwaukee St. R. Co. v.*

Linden Land Co. and another vs. Milwaukee Electric Ry. & Light Co.

*Anderson*, 90 Wis. 550; *State ex rel. Church Mut. Ins. Co.
v. Cheek*, 77 Wis. 284; *Black River Imp. Co. v. Holway*, 87
Wis. 584; *Central T. Co. v. Citizens' St. R. Co.* 80 Fed. Rep.
218; *S. C.* 82 Fed. Rep. 1; *Low v. Marysville*, 5 Cal. 214;
*California S. T. Co. v. Alta T. Co.* 22 Cal. 398; *San Fran-
cisco v. Spring Valley Water Works*, 48 Cal. 493; *Waterloo
T. R. Co. v. Cole*, 51 Cal. 381; *Omnibus R. Co. v. Baldwin*,
57 Cal. 160; *People v. C. P. R. Co.* 83 Cal. 393; *Spring Val-
ley Water Works v. Schottler*, 62 Cal. 105; *Ex parte Pritz*, 9
Iowa, 30; *Hetherington v. Bissell*, 10 Iowa, 145; *Baker &
Griffin v. Steamboat Milwaukee*, 14 Iowa, 214; *McGregor v.
Baylies*, 19 Iowa, 43; *Stange v. Dubuque*, 62 Iowa, 303;
*Denver & S. R. Co. v. Denver City R. Co.* 2 Colo. 673; *At-
kinson v. M. & C. R. Co.* 15 Ohio St. 21; *State ex rel. Att'y
Gen. v. Cincinnati*, 20 Ohio St. 18; *Pennsylvania & O. C.
Co. v. Comm'rs of Portage Co.* 27 Ohio St. 14; *Ames v. L. S.
& M. R. Co.* 21 Minn. 241; *Green v. Knife Falls B. Corp.*
35 Minn. 155; *State ex rel. Comm'rs v. Cooley*, 56 Minn. 540;
*Alexander v. Duluth*, 57 Minn. 47; *State ex rel. Childs v.
Copeland*, 66 Minn. 315; *State ex rel. Green v. Lawrence B.
Co.* 22 Kan. 438; *Topeka v. Gillett*, 32 Kan. 431; *Little Rock
v. Parish*, 36 Ark. 166; *Clegg v. School Dist.* 8 Neb. 178; 4
Thomp. Corp. § 5342; 1 Dillon, Mun. Corp. (4th ed.), § 6,
and cases in notes; 1 Morawetz, Priv. Corp. (2d ed.), §§ 10–
18, and case cited in notes; 32 Am. Law Reg. 613, 721, 816,
922, 1019, 1109.

Winslow, J.   With the somewhat novel practice followed
in this case, by which a new plaintiff owning property on a
distant street was allowed to be substituted for the original
plaintiff, and the original injunctional order was permitted
to remain in force practically without complaint for weeks,
while the new plaintiff was preparing his complaint, we are
not concerned.   No questions as to the propriety or regu-
larity of these proceedings is before us, because the present

Linden Land Co. and another vs. Milwaukee Electric Ry. & Light Co. .

appeals are simply appeals from orders refusing to vacate the preliminary injunctional order. Upon appeal from a judgment, intermediate orders involving the merits and necessarily affecting the judgment may be reviewed. Stats. 1898, sec. 3070. But we know of no provision which authorizes a review of one order upon an appeal from another. *Breed v. Ketchum*, 51 Wis. 164. That the court had jurisdiction to refuse to allow the plaintiff to arbitrarily discontinue the case, and also jurisdiction to allow another plaintiff to be substituted in his place, was decided by this court in this very case. *State ex rel. Milwaukee v. Ludwig*, 106 Wis. 226.

So the case reaches this court upon the appeal from the order of June 9th in the same condition as it was in the trial court. The substitution of the *Linden Land Company* as plaintiff in place of the original plaintiff, and the addition of *Charles J. Eigel* as a plaintiff, are accomplished facts, not open to question or review; and we are to consider and decide whether, under the pleadings and affidavits before the court, they or either of them were entitled to the injunctional order originally granted. The case presented, then, is one in which two citizens, claiming to represent many thousand similarly situated, have come into court and challenged the validity of franchises granted by the city council, and demanded judgment that the grantee of the franchises be forbidden to accept or utilize them,— a judgment which, if granted, practically vacates and annuls the franchises as effectually as if they were vacated at the suit of the state. It is familiar law that courts do not revise, control, or vacate the acts of a municipal government at the suit of private persons, except as incidental or subsidiary to the protection of some private right or prevention of some private wrong. *Pedrick v. Ripon*, 73 Wis. 622; *Nast v. Eden*, 89 Wis. 610. The private person so suing must show something more than a mere speculative or theoretical

Linden Land Co. and another vs. Milwaukee Electric Ry. & Light Co.

wrong or illegal act. He must show an actual or threatened invasion or destruction of a distinct right belonging to himself or to the body of citizens for whom he sues. He cannot sue to prevent an act merely because it is illegal. Any other rule would render the transaction of municipal business well-nigh impossible.

The present action must be tested by this rule. The claim of the plaintiffs is practically that they do come within the rule, because they allege that they are taxpayers of the city and also abutting owners upon streets covered by the franchise; and it is very evident that the action, if sustainable at all, must be on the ground that their rights either as taxpayers or as abutting owners, or both, are threatened with illegal invasion.

The claim that this is a proper taxpayers' action will first be considered. No court has been more liberal in maintaining the right of a taxpayer to vindicate the rights of himself and his fellow taxpayers against the actual or threatened malfeasance or nonfeasance of public officers than this court. The cases are numerous, and many of them recent. Such actions may be brought where municipal authorities are about to unlawfully dispose of public property or pay out public funds, or about to enter into unlawful and unauthorized contracts which will require public funds to discharge them, thus increasing the burdens of taxation, or squandering the property of the taxpayers, or both. *Webster v. Douglas Co.* 102 Wis. 181, and cases cited; *Rice v. Milwaukee*, 100 Wis. 516. And in a proper case the court will go further, and compel the unfaithful officers, and even third persons, to repay into the treasury sums already illegally paid out. These cases go on the principle that the money or property so squandered or about to be squandered is the money of the taxpayers, and hence every taxpayer has a substantial interest in it, which he is entitled to have protected. Upon similar principles a taxpayer's right to enforce

a cause of action of the corporation is upheld where the corporate officials wrongfully refuse or neglect to perform that duty. *Estate of Cole: Mulberger v. Beurhaus,* 102 Wis. 1. Here the basis of the right is not that there is necessarily a personal and direct pecuniary loss to the taxpayer, but that the public moneys, rights, or property are about to be squandered or surrendered, and that such moneys, rights, or property belong to the body of taxpayers, and are simply held in trust by the unfaithful public officials.    This is well illustrated in the case of *Estate of Cole,* just cited, where real and personal property was willed in remainder to a city in trust for the establishment of a public library and a home for the aged poor, and a controversy arose between the executors and the city, in the county court, as to whether certain expenditures upon the property should be charged against the life tenant of the property, or against the *corpus* of the estate.    The county court decided against the city, and, the city officials declining to appeal, a taxpayer intervened and took the appeal to the circuit court; and his right to do so was sustained by this court.    Here no taxpayer could be said, in strictness, to have suffered a direct or pecuniary injury by the decision of the county court, or the failure to appeal therefrom; but the illegal diminution of the trust property was a distinct invasion of the property of the corporation, in which each individual taxpayer or member of the corporation had a substantial interest, notwithstanding the property could only be used for the purposes of the trust and its entire loss would not necessarily result in increased taxation. So understood, the case is in entire harmony with the general principles laid down in the other cases in this court.

Further than this it is not believed that any case has gone in this court, nor is it believed that any further extension of the rule is expedient or necessary. So the question is whether it is shown in this case that any wrongful squan-

Linden Land Co. and another vs. Milwaukee Electric Ry. & Light Co.

dering or surrender of the moneys, property, or property rights of the city, or unlawful increase in the burdens of taxation, is threatened by the proposed ordinance, within the rules above stated.

It is claimed that such a squandering of valuable property is shown, because it is alleged that before the passage of the ordinance the city was offered $100,000 by a third party for the additional franchises granted to the defendant railway company by the ordinance, and also because it appears that the defendant company itself in the year 1898 offered to pay the city annually on the 1st of January of each year large sums of money, beginning with $50,000, and increasing the sum each year by $10,000, until it reached $100,000 annually, in case said city would grant the right to charge five-cent fares until the year 1935. These offers were, however, rejected by the city, and the present ordinance adopted, by the terms of which no moneys are to be paid to the city, but the company is required to sell twenty-five tickets for $1, good for travel during certain morning and evening hours, until January 1, 1905, and after that time good during all hours of the day.

It seems very plain to us that this action of the council cannot be called, in any proper or reasonable sense, a squandering of public funds or property. By sec. 1862, Stats. 1898, the city is empowered to grant the use of streets and bridges to street railway corporations *upon such terms as the proper authorities shall determine.* Here is a broad grant of discretionary powers. The question before the council was, What terms shall be attached to the grant? Is it more beneficial to the public to secure a cash payment, or payments which will benefit taxpayers only, or to secure lower rates of fare for the public generally, or to impose other conditions? After exercising this discretion, and deciding that the terms imposed should be a gradual reduction of fare, rather than payments of money into the treasury, it

cannot be said that any city fund has been squandered, lost, or misused.     Whether the city should receive *any* fund was a question for the council, in its discretion, to decide.     When it decided that there should be no fund, but that reduced fares or other limitations upon the grant were more desir- able for the public, it may or may not have exercised good discretion, but it has dissipated no city fund or property. And so with regard to the proposal of the third person to pay $100,000 for the additional privileges granted to the defendant company.     The additional privileges were over a few fragments of widely separated streets.     If used by the defendant company in connection with its other lines, cover- ing almost the entire city, with the system of transfers pro- vided by the ordinance, they would probably complete a harmonious system; but, if attempted to be used by an in- dependent company as separate lines, it seems probable that. they would be far less useful to the public.     It was undoubt- edly a question addressed to the sound discretion of the council, whether the franchise should be sold to a third per- son who could only run fragmentary lines, or should be granted to a company which would be required to incorpo- rate the fragments into its system, and thus furnish to the traveling public continuous trips under a transfer system from one part of the city to another for a single fare.

The same considerations evidently apply to a number of other allegations in the complaint, to the effect that the grant of the franchise will necessarily put the city to great expense in repaving, widening, and improving streets and viaducts, and will seriously injure the water system of the city, by electrolysis of the pipes, thus increasing the bur- dens of the taxpayer.     The fact that some injurious effects to streets, or water pipes in the streets, are liable to result from the granting of the franchise, does not impair the power to grant it, but simply becomes an important consideration to be taken into account in the fixing of the terms which

shall accompany the grant. This question also becomes a
question of discretion, which discretion is vested in the com-
mon council, and cannot be controlled by a taxpayer or any
body of taxpayers. We have found no other allegations,
which can reasonably be claimed to state any substantial
injuries to the plaintiffs as taxpayers, within the rules gov-
erning taxpayers' actions, and the conclusion necessarily fol-
lows that no cause of action is stated in the complaint in
favor of the plaintiffs as taxpayers only.

But the question remains whether a cause of action is
stated in favor of either plaintiff as an abutting owner of
real estate. Before proceeding to consider this question
upon the merits, it seems necessary to dispose of a prelimi-
nary question which was much argued, namely, whether
one abutting owner can maintain such an action on behalf
of all other abutting owners. It is very evident that in a
proper taxpayer's action, challenging the illegal waste or
squandering of corporate funds or property, the question is
one " of common or general interest of many persons," thus,
bringing the case within sec. 2604, Stats. 1898, and allowing
one to sue for the benefit of all, because the fund or prop-
erty threatened is undivided, and the interests of the tax-
payers therein inseparable. But it is equally evident that
the same considerations in no way apply to the interests of
abutting owners who own separate parcels of property. In
this case the interest of each property owner is separate and
distinct from that of every other property owner. One
owner in severalty is in no way interested in the injury (if
any) to his neighbor's lot. In fact, the owner of one lot
may consider his property injured, and the owner of an ad-
joining lot may consider his lot benefited, by the proposed
street railroad; and such may be, in fact, the case resulting
from the different uses to which the two lots are or may be
put.

It is true that it has been held by this court that in case

Linden Land Co. and another vs. Milwaukee Electric Ry. & Light Co.

of a threatened nuisance, affecting several parcels of real estate alike, the several owners may join in an action to prevent the projected nuisance. This principle has been applied to the construction of a bridge without legal authority, which would be a nuisance to several riparian owners (*Barnes v. Racine*, 4 Wis. 454); to the unlawful incumbering of a park or public place with buildings which would constitute a nuisance to the owners of lots fronting upon it (*Pettibone v. Hamilton*, 40 Wis. 402); also, to the diversion of water in a river to the injury of several riparian owners (*Grand Rapids W. P. Co. v. Bensley*, 75 Wis. 399). But the effect of these decisions is not that one may sue for the benefit of all, but simply that all such parties similarly affected are *proper*, though not necessary, parties to an action. *Kaukauna W. P. Co. v. Green Bay & M. C. Co.* 75 Wis. 390. They may join in one action if they choose, but they are not compelled to; and it follows logically from this that, if they do not join, no one owner is bound by the result of another's separate action. The theory of the action, where one properly sues for all, is that the result is conclusive on all who are similarly situated and whom the plaintiff rightfully represents; and such must be the theory, or else the plaintiff does *not* represent all, and the statement that he does is not only false but absurd.

It is palpably evident that the principle cannot apply to abutters, because, as said before, they may join or not, as they choose. If one can rightfully refuse to join, his rights manifestly cannot be litigated or determined in the action, and hence he cannot be bound by the result, and by no legal fiction can it be said that he has been represented in the action. It is well settled that the owners of lots in severalty cannot join as plaintiffs to set aside an illegal tax upon their separate lots; nor can they sue on behalf of themselves and other taxpayers. *Barnes v. Beloit,* 19 Wis. 93; *Pier v. Fond du Lac Co.* 53 Wis. 421. The line which divides this last-

named class of cases from the class of cases holding that two or more property owners may join to prevent a nuisance affecting their several lots alike is perhaps somewhat difficult to draw, but in any event neither rule justifies the bringing of the present action by one abutter for the benefit of all. Treating a street railway about to be laid upon a street without authority of law as a continuing nuisance to the owners of abutting lots, the most that can be said, under the decisions in this state, is that two or more owners in severalty of abutting lots similarly affected *may* join as plaintiffs, but that one cannot sue for the benefit of all, and a statement that he does so sue is mere surplusage. Whether, as in the present case, an abutting owner upon one street may join with an abutting owner upon another street a mile or more distant, even though it is intended to connect the lines upon the two streets with lines already existing, may be a serious question, but it is one which we do not feel called upon to decide. We are not now considering the case upon demurrer for improper joinder, and it seems that if it appears by the complaint and the papers used upon the motion to vacate that either plaintiff was legally entitled to have the injunctional order maintained pending the action, then the motion to vacate was properly denied.

Proceeding, then, to consider the rights of the plaintiffs as abutting owners simply, and conceding that the pleadings and affidavits show the supposed franchise to be invalid, and hence that they were entitled to an injunction preventing the laying of the railway upon the particular street in front of their several lots, it is still impossible to see how they could properly demand that the railway company should be prevented from accepting the franchise, and thus in effect annulling the entire grant. Such relief was in no way necessary to the protection of any right which they had as abutters. Their lots and all rights therein were completely and fully protected from injury when the proposed railway was

debarred from entering upon the street upon which their property abuts. They needed nothing further. The only true object and purpose of a preliminary injunctional order, either at common law or under the statute, is to prevent the commission or continuance of some act, "the commission or continuance of which during the litigation would produce injury to the plaintiff." Stats. 1898, sec. 2774. The court may enjoin any threatened act during the litigation, when such act would produce injury to the plaintiff's rights, but it will go no further than necessary for that purpose. The extent of the necessity marks the extent of the right to enjoin. To go further, and enjoin other acts which, if done, do not affect the rights in litigation in any way, is simply an exercise of arbitrary power, which cannot be defended for a moment. So it seems to us certain that, so far as the preliminary injunctional order prevented the defendant railway company from accepting the franchise, it should have been vacated, because the acceptance could in no way affect the rights of either plaintiff.

Upon the same principle it results that the *Linden Land Company*, suing to protect its rights as an abutter on Locust street, had no standing in court to insist that the injunctional order restraining the laying of tracks on First avenue, a mile and a half distant, should stand *pendente lite*. The building of a track on First avenue could not injure its property nor affect its rights as to the building of a track on Locust street a particle. And thus the case is reduced to the simple question whether the plaintiff *Eigel*, as an abutting property owner on First avenue, is shown to be entitled to an injunction *pendente lite* preventing the building of the track and operation of street cars in front of his property on First avenue.

That an abutting lot owner may enjoin the laying of a railway track which is about to be laid without authority of law on the street in front of his premises cannot be doubted

Linden Land Co. and another vs. Milwaukee Electric Ry. & Light Co.

for a moment. It is unnecessary to cite cases upon this proposition. In the present case it is claimed that the grant to the railway company is void and conveys no power to lay tracks, for several reasons, which will now be considered:

1. It is said that the laying and operation of an electric street railway, to be operated by the overhead system, with trolley wires and supporting poles, is an additional burden on the fee, and hence that it cannot be done without making compensation to the adjoining lot owners. This contention is ruled in the negative by the case of *La Crosse City R. Co. v. Higbee, ante,* p. 389, where the exact question was discussed and decided. The ordinance in the present case is essentially identical with the one involved in that case. It authorizes the carriage of passengers only, and, in the absence of a showing that it is proposed to locate poles or structures in such manner as to interfere with a property owner's right of access to his property, it must be held that the present case is ruled by the *La Crosse Case* upon this question.

2. It is claimed that sec. 1862, Stats. 1898, under which the defendant corporation is incorporated, is unconstitutional, because it attempts to authorize the formation of street railway corporations vested with the power to carry *freight* as well as passengers, thus making it a commercial railroad, and also authorizes municipal corporations to grant the use of streets to such railway companies for the carriage of *freight* and passengers, and nowhere provides for the payment of compensation to the abutting owners. It may be admitted, for the purposes of the case, that a railway authorized to carry freight as well as passengers becomes a commercial railroad instead of a street railroad, and that such a railroad, when laid in a street, becomes an additional burden on the fee, and cannot be laid without the consent of, or compensation made to, the adjoining property owners. *Chicago & N. W. R. Co. v. Milwaukee, R. & K. E. R. Co.*

95 Wis. 561. But this hardly meets the question. It is true that our statutes contain no provisions authorizing such companies to condemn private property in the streets of cities or villages, although such condemnation may be had outside of cities and villages. Stat. 1898, sec. 1863*a*.

It is not quite clear how this deficiency in the law affects the corporate character of the defendant corporation. It may render it impossible for it to lay or operate a track for the transportation of *freight* without actually purchasing the right from private owners to cross their lands, but the legislature certainly had power to authorize the formation of just such corporations; and if it neglected to provide the corporation, when formed, with a means essential to its successful operation, the result would seem to be a very unfortunate one for the corporation, and perhaps one fatal to its business success, but not fatal to its corporate character. If such a corporation attempted to condemn, it could be successfully defeated by the fact that it was given no such power; and, if it attempted to lay tracks without condemning, it would be stopped with the proposition that it was taking private property without compensation. Passing this question, however, there are other considerations which seem to us to answer the contention without serious difficulty. The law should be sustained if possible on any reasonable theory. Every intendment is in its favor. We think it may reasonably be said that this law was only intended to authorize corporations to use streets with the consent of the city for carriage of freight *as against the rights of the public* and not as against private owners, leaving such private owners in full possession of their rights to stop the construction, insist on compensation, or give their consent, as they chose. Such was substantially the construction placed upon the act authorizing telegraph companies to place their poles in streets in the case of *Krueger v. Wis. Tel. Co.* 106 Wis. 96. This construction seems to us to

be entirely reasonable. It deprives the property owner of no
substantial right, and has the additional merit that it does
not violently disturb the many valuable rights and property
interests, both public and private, which doubtless have
arisen, founded in good faith upon the validity of the legis-
lation attacked.

Furthermore, it will be noticed that the corporation does
not obtain its right to use any given street from the terms
of its charter. It might exist for a century, and, if no mu-
nicipality saw fit to grant it a franchise to use its streets, it
could do no business. In the present case the city has not
chosen to grant it any right to carry freight upon a single
street. All the franchises which it owns by purchase, as well
as the franchise now in question, simply confer the right to
carry passengers only, or, in other words, to build and main-
tain a street railroad in the usual and ordinary sense of the
term; and we do not see how it can for a moment claim the
power to carry freight over its lines in the city of Milwau-
kee, or do anything more than maintain a street railroad
for the carriage of passengers only. If it can only maintain
and operate a street railroad, it is quite difficult to see how
the plaintiffs can be injured in any way by the failure of the
legislature to endow the corporation with power to condemn
private property.

3. Another claim is that the ordinance is unconstitutional
because it is in effect a special or private law "granting cor-
porate powers or privileges," and so prohibited by sec. 31 of
art. IV of the constitution. The argument is that the ordi-
nance attempts to confer corporate powers and privileges;
that it is a special act of legislation; that, in enacting it,
the city council was simply exercising legislative power at-
tempted to be delegated to it by the state, or, in other words,
was *pro hac vice* the legislature; that under the constitutional
provision above cited the legislature itself could pass no such
law; and that the city council can possess no greater power

Linden Land Co. and another vs. Milwaukee Electric Ry. & Light Co.

than the legislature. This is an important contention, and, if well founded, is fraught with serious results to many interests; for it cannot be doubted that the power supposed to be granted to municipal corporations to grant such privileges as are here in question has been very frequently used. But there is a radical difficulty with the first premise, which demolishes the entire argument. While such franchises as were here granted are legislative grants, they are not corporate powers or privileges, within the meaning of the constitution. When granted to a corporation, they become the property of the corporation, and so may be called franchises of the corporation; but they are not "franchises essential to corporate existence, and granted as part of the organic act of incorporation." *State ex rel. Att'y Gen. v. Portage City W. Co., ante,* p. 441. Some confusion undoubtedly exists in the cases on this subject, and such franchises have been sometimes called "corporate franchises," as noted in the case last cited, but this does not affect the true character of the franchises. The distinction was pointed out by Chief Justice RYAN in the *Railroad Cases,* 35 Wis. 425, on page 560, speaking of this very clause of the constitution, where he said that the phrase "to grant corporate powers or privileges" is equivalent to the phrase "to grant corporate charters," and, further, "A franchise is not essentially corporate, and it is not the grant of a franchise which is prohibited, but of a corporate franchise; that is, as we understand it, franchise by act of incorporation." This construction was followed and approved in *Black River Imp. Co. v. Holway,* 87 Wis. 584, and, indeed, it seems, upon reflection, the only reasonable construction which can be placed on the constitutional provision. Such franchises as those before us may be sold and assigned, if assignable, or the corporation may be deprived of them by forfeiture, and yet the corporate existence will be in no way affected. This consideration effectually disposes of the argument on this point, and renders it un-

necessary to inquire whether there may not be other infirmities in the argument which are equally fatal to it.

4. Another claim made is that the council had no power to extend existing unexpired franchises long before their expiration, and that, even if it had such power, the ordinance is void because it is unreasonable. It may be noted in passing that neither of the plaintiffs owns any property abutting on any of the streets containing existing lines of railway, and hence, as abutters, they would seem to have no interest authorizing them to attack those parts of the ordinance extending the life of previous grants; but, granting that they are entitled to raise that question, we do not think the ordinance can be held void on either ground. The statute (sec. 1862, Stats. 1898) gives the municipality power to grant to street railway companies the use of streets, without limitation, save that such grant be made "upon such terms as the proper authorities shall determine." This is certainly a very broad grant of power,— certainly more comprehensive than the statute of Indiana under which the case of *City R. Co. v. Citizens' St. R. Co.* 166 U. S. 557, was decided. In that case the law required that street railway companies should first " obtain the consent of such common council to the location, survey, and construction of any street railway through or across the public streets of any city, before the construction of the same;" and it was held that, where a franchise had been granted in 1864 to a street railroad company for the term of thirty years, the unexpired franchise might legally be extended in 1880 (fourteen years before its expiration) for the term of seven years, so that it would not expire until 1901, and that the continued operation of the road was sufficient consideration for such extension. The case seems strictly applicable here. In the present case some of the existing franchises already owned by the defendant railway company expired in the year 1924, and some in succeeding years, and they

516    SUPREME COURT OF WISCONSIN.    [107

Linden Land Co. and another vs. Milwaukee Electric Ry. & Light Co.

were all extended in terms until the year 1934. We are
unable to see that there was lack of power to do this, or that
the extension of time was unreasonable. Many of the fran-
chises were granted in very recent years,— some of them as
late as the year 1890; and franchises for terms of forty and
fifty years, and even longer, are frequently upheld by the
courts. We have been unable to find, by an examination
of the ordinance, that its terms are unreasonable,— at least,
to such an extent as would justify a court in declaring it
void. To arrive at such a conclusion, the unreasonable char-
acter of the ordinance ought to be very clear.

5. We pass now to a number of objections which may be
considered together. They are, in effect, objections to the
regularity of the council proceedings in the adoption of the
ordinance. It is said that sec. 940b, Stats. 1898, which re-
quires the application for the franchise, containing the sub-
stance of the privileges asked for, to be filed with the city
clerk and published in the official paper for not less than
two weeks previous to action on such publication, was not
complied with. It is also said that certain provisions of the
city charter, requiring all ordinances to be referred to ap-
propriate committees, and not to be acted upon except after
report made by the committee, have not been complied with.
It is also said that it appears that the officers of the railway
company used corrupt methods in securing the passage of
the ordinance, in that they agreed to pay large sums to cer-
tain citizens to induce them to cease their opposition to the
passage of the ordinance.

It is sufficient to say with regard to these claims that,
whatever may be the rule elsewhere, it has been held in
this state that these questions cannot be raised at the suit
of private parties. *Stedman v. Berlin*, 97 Wis. 505. That
case was a taxpayer's action in equity brought to set aside
the grant of a franchise to build and maintain public water-
works in the city of Berlin. The grantee of the franchise had

accepted the franchise and given bond for the performance
of the requirements of the ordinance, but had not com-
menced to construct the plant.   It was charged in the com-
plaint that the franchise was void because the provisions of
sec. 940*b*, Stats. 1898, had not been complied with, and that
it had been procured by the grantee by means of improper
and undue influence exercised by him upon the members of
the common council.   This court held, however, that the
remedy to set aside a franchise irregularly or fraudulently
granted, under the circumstances there presented, was by
*quo warranto* or *scire facias* at the suit of the state, and not
in an equitable action at the suit of private parties.

The present case is substantially identical in its essential
facts with the one just cited.   It is true that no formal ac-
ceptance of the ordinance had been placed on file, but the
company was shown to be in possession of its already con-
structed lines, and transacting its business thereon, selling
tickets at the reduced rate, and performing the obligations
required of it by the terms of its new franchise.   It was
certainly quite as much in the exercise of the privileges con-
ferred by the franchise as was the grantee of the franchise
in the *Stedman Case*, who had not commenced even to build
his plant.   The principle here adopted is quite analogous to
that applied to an application for leave to bring action on
behalf of the state to annul the franchises of such a corpora-
tion on account of misuse or nonuse thereof.   Such leave
will not be given as a matter of course for every dereliction
of duty, but it will be granted, or not, as the interests of the
public seem to demand.   *State ex rel. Att'y Gen. v. Janes-
ville W. Co.* 92 Wis. 496.   So, here, upon the facts presented,
it is not at all certain that the present franchise would be
set aside at the suit of the state.   It appears that a notice
containing a full copy of the proposed ordinance was pub-
lished for more than two weeks prior to the final passage
of the ordinance.   This is claimed to have been insufficient,

by the plaintiff, because it should have been published two weeks before any action was taken by the common council, and because the ordinance was amended in some minor details just before passage. Now, it may be a serious question whether sec. 940$b$, Stats. 1898, means that the publication shall be made for two weeks before any action, however slight, or before final action. The section simply says " before action." It appears also that the ordinance as originally presented was referred to a select committee, who reported a substitute ordinance; and thus it is claimed that the requirements of the charter have been met, notwithstanding there were some minor amendments made after the report, and before passage. Furthermore, a resolution was passed by the council at the same meeting when the ordinance was passed granting the same franchises in identical terms with those contained in the ordinance; and it is claimed, and with apparent reason, that, if the ordinance fails, still the resolution may be effective. Sec. 1862 does not require the franchise to be granted by ordinance. Hence it may undoubtedly be done by resolution. The resolution was first introduced on the night of its passage. Hence the publication of notice was for two weeks previous to "any action," as well as to final action, and the charter provisions as to the reference of ordinances to committees does not apply to resolutions. Considering these facts, and the evident strenuous attempt to conform to all statutory requirements, it may be doubtful whether any court would feel that valuable franchises should be forfeited, even at the suit of the state, even though it might conclude that there was some irregularity in the proceedings. It is enough, however, that the question is not open in this action.

The same considerations, in effect, apply to the charge of corrupt practices. It is not charged that any member of the council was corrupted, but that certain citizens who opposed the ordinance were bought off with money. This

charge is explained in the answer as follows: The ordinance allowed the railway company to use a viaduct for the building of which a number of property owners had paid about $8,000, special assessments. As the building of the railroad across the viaduct turned it practically into a railway bridge and diminished its usefulness to the property owners who had contributed to its erection, they objected to such use unless they were repaid what they had put into it over and above their share as general taxpayers. In this situation, the officers of the street railway company agreed to make good to the property owners what they had paid by way of special assessments. This was done without concealment, but was known to all. Even were we disposed to find fault with the transaction, the rule of the *Stedman Case* plainly covers it.

We have discussed the case as presented upon the second motion to vacate, and any separate discussion of the first motion is unnecessary. Our conclusion is that both motions should have been granted.

*By the Court.*— Orders reversed, and action remanded with directions to vacate the preliminary injunctional order and for further proceedings according to law.