SUPERIOR WATER, LIGHT & POWER COMPANY, Respondent,
vs. CITY OF SUPERIOR and others, Appellants.

*June 4, 1920—January 11, 1921.*
*May 7—May 31, 1921.*

*Municipal corporations: Ordinances: Amendment: Merger: Water-
works system: Acquisition by municipality: Eminent domain:
Condemnation: Valuation of property: Specific performance:
Franchise of corporation: Nature and kinds: Control by state:
Reserved power: Lands without the state: Power of munici-
pality to acquire: Compelling conveyance of entire property
of corporation.*

1. An amendment to a city ordinance which grants a franchise to
   a water company is merged in and becomes a part of such
   ordinance, and stands on no different footing with reference
   to the power of the state to assert its authority in respect
   thereto than any other provision contained in the ordinance.
2. A city in proceeding to acquire the property of a water company
   under the power of eminent domain is exercising the sover-
   eignty of the state, which cannot be bartered away by a
   municipal ordinance or in any other manner.
3. In a state law embodying a comprehensive plan for the regu-
   lation and control of public-service corporations and for the
   acquirement of their property in given cases by munici-
   palities, the method provided for valuing such property with
   a view of awarding just compensation therefor is paramount
   to and exclusive of that contained in a city ordinance for
   determining such valuation; especially in the absence of
   allegation in the complaint that such method will not afford
   just compensation.
4. In a proceeding by a city to acquire the property of a water
   company under the power of eminent domain, if the method of
   valuation of such property provided for in an ordinance of
   the city is productive of unconscionable results and will
   result in an excessive valuation, then it will be considered
   whether a court of equity should, in the exercise of its dis-
   cretion, invoke its power to decree a specific performance.
[5. Whether the performance by a city of an alleged contract with
   a public-service corporation is excused on the ground that the
   state has withdrawn from the city the power to perform it, not
   decided.]

6. An ordinance of the common council of a city granting to a public-service corporation certain rights, powers, and privileges constitutes a legislative franchise emanating from the state to such corporation; the common council merely acts as the agent of the state, and the privileges conferred by such ordinance are as much a legislative franchise as if it had been granted by an act of the legislature.

7. In such case, if the corporation fails to comply with the requirements of the ordinance, or fails to perform any of the duties imposed upon it by the terms thereof, the state may maintain proceedings to vacate its charter or forfeit the franchise; and the state has the same right and authority to interefere therewith, change or alter the same as though it were granted directly by the legislature.

8. The power reserved to the state in sec. 1, art. XI, of its constitution to alter or repeal all general or special acts at any time after their passage, extends and applies to the franchise to *be* a corporation as well as to the franchise *of* a corporation, and the right under such reserved power "to withdraw a franchise must authorize a withdrawal of every and any right or privilege which is a part of such franchise." (Certain language in opinions of MARSHALL, J., to the contrary, disapproved.)

*On rehearing:*

9. A proceeding by a city to acquire a waterworks plant under the public utilities law is in the nature of condemnation proceedings even where the water company has voluntarily accepted an indeterminate permit, in view of sub. 4, sec. 1797m—79, Stats.

10. The state cannot condemn property beyond its borders and over which it exercises no jurisdiction whatever.

11. The franchise of a public utility corporation and the property devoted by it to the performance of the duties imposed on it by the franchise constitute an entirety, and the property, neither in its entirety nor in parcels, can be separated from the franchise; and, since the franchise is deemed the principal thing and is an incorporeal hereditament, the entire property assumes the character of personalty.

12. The city can acquire title to the entire plant, though a portion of the intake pipe extended beyond the boundaries of the state, since the entire property of a water company used in the discharge of the duties imposed upon it by the franchise, together with such franchise, constitute an entirety partaking of the nature of personal property, and hence such portion of the plant as was physically located beyond the borders of

the state could be purchased as personal property, having a situs within the state; and equity has ample power to compel the water company to convey such portion.

13. The franchise of a water company to supply water to a city and its inhabitants is a contract between the company and the state.

14. A city may acquire title to a waterworks plant a part of which crosses the border of the state into another state, since in so doing it operates in its proprietary and not in its governmental capacity.

APPEAL from an order of the circuit court for Douglas county: JAMES WICKHAM, Judge. *Reversed.*

Action to enjoin the city of *Superior* and its officers from proceeding under the provisions of secs. 1797*m*—1 to 1797*m*—109, Stats., to acquire the waterworks and property of the plaintiff, and compelling the city to compensate the plaintiff for its property according to the provisions of a certain ordinance of the city of *Superior* granting to the plaintiff a franchise to build, operate, and maintain waterworks in said city. From an order overruling a demurrer to the complaint the defendants appealed.

The complaint shows that the Superior Water Works Company (hereinafter referred to as the *Water Company*) was incorporated by ch. 359 of the private and local laws of Wisconsin for the year 1866. By the terms of the act it was provided that said company may, for the purpose of supplying the town of Superior and its neighborhood with pure water, "enter upon any lands, streets, highways, roads, lanes or public squares through which they may deem it proper to carry the water so taken, and lay, construct, repair and replace any pipes, conduits, hydrants, jets, fountains," etc., and that "the said company may make any agreements, contracts, grants and leases for the sale, use and distribution of water as may be agreed upon between said company and any person or persons, associations and corporations, and with the town of Superior, or neighboring

towns; or the said company itself may take and use the surplus water for manufacturing and other purposes; which said agreements, contracts, grants and leases shall be valid and effectual in law."

On the 15th day of October, 1887, the village of Superior was a duly incorporated village under the laws of the state of Wisconsin. On that date the village board of the village of Superior, for the purpose of providing for the protection of public and private property in said village against fire and supplying the inhabitants thereof with water for domestic and public uses, passed an ordinance granting to the Superior Water Works Company the privilege of establishing, maintaining, and operating a system of waterworks in said city, in and by the terms of which it was provided that the said village of Superior grant to no other party or parties a similar franchise for the period of thirty years, and that "at the expiration of the said thirty years, should said village refuse to grant to the said Superior Water Works Company, its successors or assigns, the right to continue and maintain said system of waterworks for another term of thirty years, upon the same terms and conditions as may exist between the said village or city and the said Superior Water Works Company, at the expiration of the first thirty years, in and upon the public grounds and streets of said village, and to supply the said village and the inhabitants thereof with water on reasonable terms, then and in such case, the village shall purchase from said Superior Water Works Company, its successors or assigns, said system of waterworks, and the property connected therewith, at a fair valuation as provided for in sec. 13."

By sec. 13 it was provided that the city might purchase and the company bound itself to sell its property, franchises, etc., to the city at the expiration of ten years from the passage of the ordinance, and at intervals of five years thereafter, in which case the village and the company were

each to select an appraiser, the two to select a third, who should determine the value of the said waterworks; their valuation to constitute the purchase price to be paid therefor.

It was provided that the main source of water supply should be the Bay of Superior, and that the water should be filtered through a sand-filled crib, and then by an additional process of mechanical filtration, either by the "Hyatt System" or some other system of filtration giving equally pure water. "It being agreed that the water so filtered is to be pure and wholesome and suitable for both public and domestic use." It was also provided that if the said village of Superior shall procure for the said Superior Water Works Company without cost or expense to said company the valid and indefeasible right to extend and lay its pipes across the said Bay of Superior and across Minnesota Point to the shores of and into Lake Superior on and along the shortest line from the location of its pumping station to the shores of said lake, the said Superior Water Works Company shall, within one year after receiving notice of the acquirement of said right of way, extend its pipes into Lake Superior and take the supply of water therefrom.

On March 25, 1889, the territory constituting the village of Superior was incorporated into the city of *Superior* under the laws of Wisconsin for the year 1889. On November. 1, 1889, said Superior Water Works Company sold, assigned, transferred, and conveyed to the plaintiff, *Superior Water, Light & Power Company,* its said waterworks system and all its property, real and personal, and all its rights under the ordinances of the village or city of *Superior.* On October 1, 1889, the city council of the city of *Superior* passed and adopted the following ordinance:

"Section I. Ordinance number 5 of the general ordinances of the village (now city) of *Superior,* entitled 'An ordinance amending and re-enacting section 13 of an ordinance authorizing the Superior Water Works Company, its suc-

cessors or assigns, to construct, operate and maintain a system of waterworks in the village of Superior, Douglas county, Wisconsin, and contracting with said company for a supply of water for the use of said village and the inhabitants thereof, and defining their rights, privileges and powers,' is hereby amended by striking out of said ordinance all of said ordinance after the words 'section 13,' where the said words 'section 13' occur, in the thirteenth line thereof, and inserting in lieu thereof the following:

"This ordinance is passed upon the express condition that at the expiration of twenty years after the date of the passage of this ordinance and of every fifth year thereafter, the city of *Superior* may, at its option, purchase from the said Superior Water Works Company, its successors or assigns, the entire plant of the said Superior Water Works Company, its successors or assigns, and including all franchises theretofore granted to said Superior Water Works Company, its successors or assigns, by the village or city of *Superior*, by paying therefor, in cash, an amount of money of which the net earnings of said Superior Water Works Company, for the year next preceding the purchase thereof, by said city, shall be five per centum. Such purchase shall be made in the following manner, to wit: The common council at its first regular meeting after the expiration of said twenty years, or of any fifth year thereafter, may pass an ordinance declaring its intention to purchase said plant and franchises, appropriating the necessary funds therefor; and directing the city clerk of said city to serve upon said Superior Water Works Company, its successors or assigns, a copy of said ordinance, together with a notice that at the expiration of one year from the date of the service of said notice the said city will pay to said Superior Water Works Company, its successors or assigns, the price of said plant and franchises, determined as by this ordinance provided, and will assume possession of said plant and franchises. Commencing with the day following the date of the service of such notice, the said Superior Water Works Company, its successors or assigns, shall keep an accurate account of all receipts and disbursements of said company, in a set of books kept expressly for that purpose and for no other, which said books shall, at the expiration of each

quarter year thereafter, be open to the inspection of the city comptroller of said city. At the expiration of one year from the date of the service of the notice above provided for, the said Superior Water Works Company, its successors or assigns, shall submit to the comptroller of said city the said books of account, and the price to be paid for said plant and franchises shall be determined therefrom, as herein-before provided, and upon the payment, in full, of said price, the said Superior Water Works Company, its successors or assigns, shall surrender to said city its said plant and fran-chises complete. The words 'net earnings,' as used in this ordinance, shall mean the gross earnings of said waterworks, less the actual operating expenses thereof.

"Section II. This ordinance is passed upon the con-sideration to the city of *Superior* that the said city is hereby released and relieved from the duty, cost and expense of procuring, for said Superior Water Works Company, the valid and indefeasible right to extend and lay its pipes across the Bay of Superior and across Minnesota Point, to the shores of and into Lake Superior, as provided in section 2 of said ordinance number one of the general ordinances of the village of Superior, and that all that part of said section No. 2, commencing with the word 'provided' in the twentieth line thereof, down to and including the word 'completed' in the sixty-second line thereof, is hereby repealed. And this said ordinance is passed upon the further consideration to the city of *Superior,* that by the acceptance hereof the said Superior Water Works Company binds itself, its suc-cessors and assigns, to obtain at its own expense an adequate supply of good and wholesome water for domestic and public purposes from said Lake Superior and to furnish the same to the inhabitants of said city and to said city as provided in said ordinance number one as hereby amended within two years from the acceptance of this ordinance by said Superior Water Works Company.

"Section III. This ordinance is passed with the consent of the Superior Water Works Company, and upon filing a written acceptance by it with the city clerk of the said city of *Superior* the said ordinance with all other ordinances of said city or the village of Superior granting to the said Superior Water Works Company any rights or franchises

shall be and become and is hereby made a binding contract as so amended and modified."

It is alleged in the complaint that the franchise of the plaintiff expired on October 15, 1917, and thereupon it became and was the duty of the city of *Superior* to purchase the said waterworks system and the property connected therewith from this plaintiff pursuant to the provisions of its franchise-ordinance, as set forth in the statement of facts herein, unless the city of *Superior* should elect to grant to said plaintiff the right to continue and maintain said system of waterworks for another term of thirty years under the same terms and conditions as existed on said October 15, 1917, between the said city of *Superior* and the plaintiff; that the plaintiff requested the mayor and council of said city to determine whether said city would purchase said waterworks system or would exercise its election to renew said franchise, and that thereupon the mayor and council wholly repudiated the obligation of said city to purchase said waterworks system under the provisions of the ordinance or franchise, and denied the existence and validity of the contract on the part of the city to purchase as aforesaid, and began proceedings under the provisions of the public utility law, secs. 1797*m*—1 to 1797*m*—109 of the Wisconsin Statutes, to acquire the said waterworks system, together with other property of this plaintiff, and on October 8, 1918, the mayor and council of said city passed and adopted a resolution declaring the intention and determination of said city to condemn, purchase, and take over the plants, equipments, and properties of the plaintiff and directing the calling and holding of a special election thereon and the taking of the necessary action and proceedings therefor; that said election was held, and a majority of the votes cast were in favor of acquiring said plant under the provisions of said public utility law.

For the appellants there was a brief by *T. L. McIntosh,* and oral argument by *Mr. McIntosh* and *Mr. Louis Hanitch,* both of Superior.

For the respondent there was a brief by *Grace, Fridley & Crawford* of Superior, attorneys, and a separate brief by *Harry L. Butler* of Madison, of counsel; and the cause was argued orally by *Mr. Butler* and *Mr. C. R. Fridley.*

The following opinion was filed January 11, 1921:

OWEN, J. The complaint discloses the fact that the city of *Superior* has determined to take over the plant, property, and equipment of the *Water Company,* and the real question in controversy is whether the compensation to be paid by the city is to be determined in the manner provided in the franchise-ordinance or pursuant to the provisions of the public utility laws, secs. 1797*m*—1 to 1797*m*—109, Stats.

The original franchise was granted by the village of Superior to the Superior Water Works Company, plaintiff's assignor, by an ordinance passed and adopted October 15, 1887. In and by the terms of that ordinance it was provided that "should said village refuse to grant to the said Superior Water Works Company, its successors or assigns, the right to continue and maintain said system of waterworks for another term of thirty years, upon the same terms and conditions as may exist between the said village or city and the said Superior Water Works Company, at the expiration of the first thirty years, in and upon the public grounds and streets of said village, and to supply the said village and the inhabitants thereof with water on reasonable terms, then and in such case the village shall purchase from said Superior Water Works Company, its successors or assigns, said system of waterworks, and the property connected therewith, at a fair valuation as provided in sec. 13."

Sec. 13 provided, in a comprehensive way, for the appraisal of the property of the waterworks company by three appraisers, in the event that the city should exercise any of the various options reserved to it in the franchise-ordinance to purchase the plant. The water supply was to be taken from the Bay of Superior. The *Water Company* was required to filter the water through a sand-filled crib, and then by an additional process of mechanical filtration, either by the "Hyatt System" or some other system of filtration giving equally pure water. It was also provided that if the said village "shall procure for the said Superior Water Works Company without cost or expense to said company the valid and indefeasible right to extend and lay its pipes across the said Bay of Superior and across Minnesota Point to the shores of and into Lake Superior," the said *Water Company* shall extend its pipes into Lake Superior and take therefrom the supply of water for the said village.

After the incorporation of the city of *Superior* this franchise-ordinance was amended by an ordinance passed and adopted by the common council of the city of *Superior* under date of October 1, 1889, set forth in the statement of facts. This ordinance released and relieved the city of *Superior* from the duty of procuring the right of way across Minnesota Point in order to enable the *Water Company* to extend its pipes and mains into Lake Superior, and bound the *Water Company* to obtain at its own expense an adequate supply of good and wholesome water from said lake. It also amended sec. 13 so as to provide that, in case of the taking over of the plant, property, and equipment of the *Water Company*, the city should pay therefor an amount of which the net earnings of said *Water Company* for the year next preceding the purchase thereof by said city shall be five per centum, to be determined in the manner provided in and by the terms of the amending ordinance.

It is earnestly contended by respondent that this ordinance constitutes a contract, entered into by the city in its proprietary capacity, which is immune from subsequent legislative interference. An orderly consideration of the issues presented requires that we first determine the character and effect of this ordinance. It is to be noted that it was adopted as an amendment to the original franchise-ordinance. True, there was an exchange of equivalents between the city and the *Water Company,* inducing the consent of both parties to the amendment. The *Water Company* was relieved of the necessity of maintaining filtration plants; the city was relieved of its obligation to procure the right of way across Minnesota Point; and a different method was provided for determining the amount which the city was to pay for the plant in case it should exercise its option to buy the same. For aught that appears in the complaint, this might have resulted to the advantage of either party, or that advantage might have rested entirely in a simple and definite method of fixing the amount of the purchase price.

The effect of this ordinance was to amend the original franchise-ordinance. Thereafter, the franchise of the *Water Company* was evidenced by the original franchise-ordinance of the village of Superior, as amended by the ordinance of October 1, 1889. Thereafter, the franchise of the *Water Company* provided that in case of the purchase by the city of the plant, property, and equipment of the *Water Company* the city should pay compensation therefor to be determined in the manner provided in the franchise, which was the manner provided for in the amendment.

"When an amendment to a statute is adopted, there are not two separate enactments, the old and the new, but by their union there is produced one law, namely, the statute as amended." Black, Interp. of Laws (2d ed.) 574. The amendatory ordinance was merged in and became a part of the original franchise, and the right of the *Water Com-*

*pany* to insist that its property shall be valued as therein provided is no greater than if the method had remained as originally provided therein. This particular feature of the *Water Company's* franchise, therefore, stands on no different footing with reference to the power of the state to interfere therewith than any other provision contained in the ordinance.

It is well settled in this state that an ordinance of this kind constitutes a legislative franchise emanating from the state to the corporation. The common council acts as the agent of the state, and the privileges conferred by its ordinance are as much a legislative franchise as if it had been granted by an act of the legislature. *State ex rel. Att'y Gen. v. Madison St. R. Co.* 72 Wis. 612, 40 N. W. 487; *State ex rel. Cream City R. Co. v. Hilbert,* 72 Wis. 184, 39 N. W. 326; *Ashland v. Wheeler,* 88 Wis. 607, 60 N. W. 818; *State ex rel. Att'y Gen. v. Portage City W. Co.* 107 Wis. 441, 83 N. W. 697. And in case the corporation fails to comply with the requirements of the ordinance, or fails to perform any of the duties imposed upon it by the terms thereof, the state may maintain proceedings to vacate its charter or forfeit the franchise. *State ex rel. Att'y Gen. v. Madison St. R. Co.* 72 Wis. 612, 40 N. W. 487; *Stedman v. Berlin,* 97 Wis. 505, 73 N. W. 57; *State ex rel. Att'y Gen. v. Portage City W. Co.* 107 Wis. 441, 83 N. W. 697. The franchise granted to the Superior Water Works Company, therefore, was a legislative franchise granted by the state, and the state has the same right and authority to interfere therewith, change or alter the same, as though it were granted directly by the legislature, as in the case of *State v. Milwaukee G. L. Co.* 29 Wis. 454.

We now come to consider the question of the effect of the enactment of the public utility law (secs. 1797*m*—1 to 1797*m*—109, Stats.) upon respondent's franchise. That law was originally enacted by ch. 499 of the Laws of 1907.

By its terms, any public utility, as therein defined, was authorized to surrender its then existing franchise and take in lieu thereof a franchise under the public utility law, called an indeterminate permit. This indeterminate permit was subject to the provisions of the public utility law, which in effect thereafter constituted its charter. The respondent did not act under the optional provision of this law, did not surrender its franchise, and did not accept the indeterminate permit provided for by the public utility law. By ch. 596 of the Laws of 1911 this optional feature of the public utility law was made mandatory, and it provided that every license, permit, or franchise granted to a public utility prior to July 11, 1907, is so altered and amended as to constitute and to be an indeterminate permit within the meaning of that law. The act also grants to any municipality power to acquire by condemnation any public utility in the manner therein prescribed, and it is under and by virtue of such provisions that the city is proceeding for the acquirement of the plant, property, and equipment of the respondent.

Respondent contends that the legislature had no power to arbitrarily deprive it of the franchise conferred upon it by the village and city ordinances heretofore mentioned, and that, not having voluntarily submitted to the provisions of the public utility law, it is not bound thereby. The public utility law has been under consideration by this court a number of times (*Manitowoc v. Manitowoc & N. T. Co.* 145 Wis. 13, 129 N. W. 925; *La Crosse v. La Crosse G. & E. Co.* 145 Wis. 408, 130 N. W. 530; *Kenosha v. Kenosha Home Tel. Co.* 149 Wis. 338, 135 N. W. 848) and declared valid in the light of the objections there raised to its validity. In none of those cases, however, was the question presented of the power of the legislature to substitute the public utility law in lieu of a local municipal franchise against the consent of the public utility. In each of those cases the public utility had voluntarily surrendered its existing franchise and taken in lieu thereof the indeterminate

permit and submitted itself to the provisions of the public utility law. The question here raised, therefore, as to the power of the legislature to compel the substitution of the public utility law for the existing franchise against the consent of the public utility, confronts us as an original proposition.

Concededly the power of the state to work this substitution of franchises rests upon the reserved power of the constitution, found in sec. 1, art. XI, which reads as follows:

"Corporations without banking powers or privileges may be formed under general laws, but shall not be created by special act, except for municipal purposes, and in cases where, in the judgment of the legislature, the objects of the corporation cannot be attained under general laws. All general laws or special acts enacted under the provisions of this section may be altered or repealed by the legislature at any time after their passage."

Respondent contends that this provision of the constitution has no application to the ordinance constituting its franchise, and that it does not confer power upon the legislature to alter or amend the same. Its contention is that the only general laws or special acts which could be enacted under the provisions of this section are those under which a corporation is formed or created, hence it is only laws for the formation of corporations which may be altered or repealed. Counsel points a distinction between what he calls a corporate franchise, that is, a franchise granting corporate existence and which is not the property of the corporation, and a franchise acquired by a corporation after corporate existence commenced, that it may part with or be deprived of without affecting its corporate existence and which may survive the death of the corporation. As we shall have occasion frequently to refer to these different classes of franchises as we proceed, we shall, for brevity, refer to the former as the primary, and to the latter as the

secondary, franchise of a corporation. We shall refer to the power to alter or repeal, mentioned in sec. 1, art. XI, Const., as the reserved power.

Counsel for respondent rests his contention that this reserved power is limited to the alteration or repeal of the primary franchise of a corporation upon a consideration and analysis of the literal terms of sec. 1, art. XI. While we are not disposed to disparage or question the legitimacy of counsel's logic, we must decline to follow him into an inviting field of inquiry. We think the time has long since passed when the consideration of this clause in this respect may be considered an original proposition. This clause of our constitution received consideration at a very early day, and its scope and purpose was declared in the early decisions of this court, ranging from the third to the thirty-fifth Wisconsin Reports. It was considered in two cases in the third Wisconsin (*Madison, W. & M. P. Co. v. Reynolds,* 287; *Pratt v. Brown,* 603), but six years after the adoption of the constitution. It was also under consideration in *Nazro v. Merchants' Mut. Ins. Co.* 14 Wis. 295; *Kenosha, R. & R. I. R. Co. v. Marsh,* 17 Wis. 13; *Whiting v. S. & F. du L. R. Co.* 25 Wis. 167; *State v. Milwaukee G. L. Co.* 29 Wis. 454; *Att'y Gen. v. Railroad Cos.* 35 Wis. 425; *West Wis. R. Co. v. Trempealeau Co.* 35 Wis. 257. It is manifest from a perusal of those cases that there was no confusion in the minds of the then members of this court concerning the object, scope, or purpose of the provision. While what was said in some of those cases with reference to this reserved power was possibly *obiter,* we regard the expressions of opinion as authoritative nevertheless, whether *obiter* or material to the question involved. There is a uniformity of opinion running through all of those cases with reference to the scope and purpose of this constitutional provision characterized by an assurance that suggests a thorough understanding of the subject treated, and in none

of these cases do we find an intimation that the reserved power is confined to the primary franchise of a corporation.

In *Madison, W. & M. P. Co. v. Reynolds,* 3 Wis. 287, it was held that a power of alteration reserved in an act amending the act incorporating the company, which amendment was accepted by it, reserved to the legislature the power to alter the rate of toll provided in the charter act.

In *Pratt v. Brown,* 3 Wis. 603, it was held that the legislature under the reserved power, in repealing the mill-dam law, had power to divest a corporation of its franchise of easement to flow lands acquired thereunder.

In *Nazro v. Merchants' Mut. Ins. Co.* 14 Wis. 295, was involved an amendment to the special act incorporating the insurance company, by which the trustees were authorized to change the company from a mutual to a stock company, thus changing the contract relation between the corporation and its members without their consent. The power of the legislature to pass the amending act was rested upon the reserved power of the constitution.

*Kenosha, R. & R. I. R. Co. v. Marsh,* 17 Wis. 13, involved an act of the legislature amending a special railroad incorporation act, changing the lines of road. It was held that this change released the subscribers to the company's stock. In this connection it was considered whether the constitutional reserved power might operate to give the amending act the effect to bind the stock subscribers. In that case it was said that the object of the reserved clause was to avoid the effect of the decisions of the federal supreme court holding corporate charters to be contracts protected under the federal constitution, "so as to enable the state to impose such salutary restraint upon these bodies as experience might prove to be necessary," and adding: "Undoubtedly the legislature might, under this power, impose new duties and new restraints upon corporations in the prosecution of the enterprises already undertaken. And

provisions of this nature would be binding whether assented to or not."

In *Whiting v. S. & F. du L. R. Co.* 25 Wis. 167, the reserved power is discussed *arguendo,* and it is said that the power of the state to regulate the tolls of railroad companies cannot be lost, because the power is reserved to the legislature under sec. 1, art. XI, Const., to alter or repeal all charters or acts of incorporation, and to limit tolls and fares to a reasonable sum.

In *State v. Milwaukee G. L. Co.* 29 Wis. 454, where a charter granting an exclusive franchise to supply gas to the city of Milwaukee was under consideration, the court declared that "the legislature retains control over such charters in this state, and has the power to take away any exclusive privilege or franchise which it may have improvidently granted."

In *Chapin v. Crusen,* 31 Wis. 209, 215, the court, in holding that the legislature might repeal a dam franchise granted to natural persons, referred to sec. 1, art. XI, Const., and said, *arguendo:* "Had this franchise been conferred on such a corporation, there can be no doubt that the legislature might take it away."

In *West Wis. R. Co. v. Trempealeau Co.* 35 Wis. 257, it was held that an act of the legislature subjecting to taxation certain lands of a railroad company which had been exempted from taxation by a prior act separate and apart from the act of incorporation, was a valid exercise of the reserved power. In that case Mr. Justice COLE gives elaborate consideration to the scope and purpose of the reserved clause of the constitution, saying among other things:

"The object and historical origin of the provision in the constitution of this state are matters known to all professional men. They were, through this paramount authority, to retain and secure to the state full power and control over

corporate franchises, rights and privileges which it might grant,—a power and control which the state was in a measure deprived of by the federal constitution, as that instrument had been interpreted in the celebrated *Dartmouth College Case*. With the grant of exemption from taxation was annexed the reservation that such grant might be altered or revoked by the legislature at any time after its passage. It was a qualification of the grant, and the subsequent exercise of the reserved power cannot be regarded as an act impairing the obligation of contracts."

In *Att'y Gen. v. Railroad Cos.* 35 Wis. 425, 562 *et seq.,* the question of the reserved power also receives elaborate consideration by Mr. Chief Justice RYAN. The previous decisions of this court are reviewed, the *Dartmouth College Case* is considered and criticised, its baneful consequences to the public interest are pointed out, that the purpose of the reserved power was to save the state from the pernicious effects of that decision is declared, and it was distinctly held that ch. 273, Laws 1874, fixing the maximum rates to be charged by railroad companies, was a valid exercise of legislative power notwithstanding the charters of such railroad companies granted them unlimited right to impose rates and charges in their discretion. In summarizing the law upon that question (p. 574) it is said:

"And, by force of the constitutional power reserved and of the uniform construction and application of it, the rule in the *Dartmouth College Case,* as applied to corporations, never had place in this state, never was the law here. The state emancipated itself from the thraldom of that decision in the act of becoming a state; and corporations since created here have never been above the law of the land."

The early judges who thus discussed, considered, and applied this clause of our constitution were of a time when the decision of the *Dartmouth College Case* was still a subject of criticism and resentment. The reserved power was an invention of their generation, and they understood well its purposes. Prompted by the suggestion of Mr. Jus-

tice STORY in his concurring opinion in that case, that if the states desired to retain the power to alter or amend corporate charters they should reserve it in the grant, many states provided by general statutes that all corporate grants should be subject to the power to alter or amend. Other states made similar provision in the respective charters as granted, while still others, subsequently coming into the Union, including our own, reserved such power in the constitution. While there was a lack of similarity in the language used, the purpose intended to be accomplished was uniform. The purpose of all the states was to preserve a well-recognized incident of sovereignty, the right to regulate and control corporations of their own creation, to the end that the recipients of corporate grants—which may seem wise today and prove improvident tomorrow—should not be permitted to convert the bounty of the state into an instrument for the oppression of its people. This result could not be accomplished by a reservation of power to alter or amend the primary franchise of the corporation. It is the use made of the secondary franchise, grants in the nature of property which may be turned to the public detriment, that must be kept under the control and regulation of the state if the generosity of the state is not to be turned to the exploitation of its people. And so far as our investigations have gone, reserved clauses of this character have been given the scope and effect necessary for the accomplishment of this purpose. "The reservation affects the entire relation between the state and corporation, and places under legislative control all rights, privileges, and immunities derived by its charter directly from the state." *Tomlinson v. Jessup,* 15 Wall. 454.

The supreme court of the United States has been liberal in its construction of similar provisions reserving to the states power to alter or amend corporate charters, as a consideration of the following cases decided by that court

will indicate: *Tomlinson v. Jessup,* 15 Wall. 454, 456; *Miller v. State,* 15 Wall. 478; *Holyoke Co. v. Lyman,* 15 Wall. 500; *Shields v. Ohio,* 95 U. S. 319, 324; *Railroad Co. v. Maine,* 96 U. S. 499, 500; *Greenwood v. Freight Co.* 105 U. S. 13, 17; *Railroad Co. v. Georgia,* 98 U. S. 359, 361; *Close v. Glenwood Cemetery,* 107 U. S. 466, 2 Sup. Ct. 267; *Spring Valley W. W. Co. v. Schottler,* 110 U. S. 353, 4 Sup. Ct. 48; *Hamilton G. L. & C. Co. v. Hamilton,* 146 U. S. 258, 13 Sup. Ct. 90; *New York & N. E. R. Co. v. Bristol,* 151 U. S. 556, 14 Sup. Ct. 437; *Pennsylvania College Cases,* 13 Wall. 190; *Sinking-Fund Cases,* 99 U. S. 700; *Stanislaus Co. v. San Joaquin & K. R. C. & I. Co.* 192 U. S. 201, 24 Sup. Ct. 241.

The disposition of the federal supreme court to construe all such reservations to give effect to the evident spirit and purpose thereof is indicated in *Railroad Co. v. Georgia,* 98 U. S. 359. An act of the legislature of Georgia incorporating a railroad company conferred upon it a limited exemption from taxation. A section of the general statutes of that state provided that "in all cases of private charters, hereafter granted, the state reserves the right to withdraw the franchise, unless such right is expressly negatived in the charter." It was held that a subsequent legislative act taxing the property of such corporation as other property in the state was taxed was not prohibited by that provision of the constitution of the United States which declares that no state shall pass a law impairing the obligation of contracts. The court said:

"No such right was negatived in the charter granted to the plaintiffs in error. Consequently the franchise was held subject to a power in the state to withdraw it, and subject to be changed, modified, or destroyed at the will of its grantor or creator. These provisions of the code became, in substance, a part of the charter. . . . It is quite too narrow a definition of the word 'franchise,' used in this statute, to

hold it as meaning only the right to be a corporation. The word is generic, covering all the rights granted by the legislature. As the greater power includes every less power which is a part of it, the right to withdraw a franchise must authorize a withdrawal of every and any right or privilege which is a part of the franchise."

It is apparent that a narrow or literal construction of the reservation provision found in this statute of the state of Georgia would have limited the reserved power to the franchise to be a corporation; but, without hesitation, the court pronounces that "too narrow a definition of the word 'franchise,'" and very readily construes it to apply to what we here term the secondary franchise of a corporation. In doing so the court simply gave effect to the general understanding concerning the purpose and scope of such reservations, and such is the spirit in which the reserved power of our own constitution was construed by early decisions of this court.

While there has been no general discussion of the nature and scope of the reserved power in the decisions of this court subsequent to *Att'y Gen. v. Railroad Cos.* 35 Wis. 425, that feature thereof seemingly having been considered as settled by the elaborate consideration there given it, it nevertheless has been frequently applied by this court since that time to justify legislation modifying corporate grants in the nature of secondary franchises, as will be seen by the following cases:

In *State ex rel. Cream City R. Co. v. Hilbert,* 72 Wis. 184, 39 N. W. 326, it was held that the legislature, under the constitutional reserved power, could and did alter the terms of a street railway franchise previously granted fixing the rates of license fee per car which it required to be paid to the city. In that case the original license fee was fixed by a city ordinance enacted under the terms of a general law. The franchise privilege in no way related to the franchise

to be a corporation and clearly not essential to corporate existence.

In *Ashland v. Wheeler*, 88 Wis. 607, 60 N. W. 818, although the statement is *obiter* in the case, the court declared that the legislature, under the reserved power, may alter and regulate the rates of a public-service company as prescribed in the municipal franchise-ordinance.

In *Chicago, M. & St. P. R. Co. v. Milwaukee*, 97 Wis. 418, 72 N. W. 1118, in an opinion by Mr. Justice MAR-SHALL, it was held that a Wisconsin railroad corporation is not entitled to damages for the crossing of its tracks by a highway, nor to compensation for the cost thereby imposed upon it of constructing crossing-gates, cattle-guards, planking between the rails, or other structures required to make a safe crossing, because the burden of these structures could be imposed upon the company under the police power and under the power reserved in sec. 1, art. XI, of the state constitution to amend corporate charters. In the course of the opinion it is said:

"It may be laid down as established beyond reasonable controversy that railroad corporations are subject to all such reasonable regulations as may from time to time be prescribed by legislative authority, pursuant to the police power incident to the sovereignty of the state, and are also subject to the power reserved under the constitution, to alter or amend corporate charters."

In *State v. Railway Cos.* 128 Wis. 449, at p. 505 (108 N. W. 594), the reserved power of the constitution was invoked to sustain the general laws fixing the license fees to be paid by railroad companies to the state. The successive statutes involved are treated as a part of the corporate charters of the railroad companies as inhering therein, but the rights affected were clearly not rights essential to corporate existence, nor a part of the franchise to be a corporation.

In *Manitowoc v. Manitowoc & N. T. Co.* 145 Wis. 13, 129 N. W. 925, it was said, in an opinion by Mr. Justice

BARNES, that the right conferred on a street railway company to use the public streets under sec. 1862 or sec. 1863, Stats., becomes one of the corporate franchises of the corporation to which it is granted, the city acting as the delegated agent of the state in granting it, and that the reserved power of amendment or repeal contained in sec. 1, art. XI, Const., would seem to empower the legislature to modify the conditions on which such franchise was given, as well as to repeal or amend the franchise itself.

The only suggestion coming from any member of this court, from the beginning of state government down to the present time, that the reserved power does not extend to the secondary franchises of a corporation, is found in an independent opinion, in the nature of an *erratum,* filed by Mr. Justice MARSHALL in the case of *Calumet S. Co. v. Chilton,* 148 Wis. 334, 135 N. W. 131. In that opinion he speaks of the difference between the franchise of a corporation and a franchise granting corporate existence, and intimates that the reserved power of the constitution applies only to the primary franchise, which he calls a corporate franchise. In his dissenting opinion, concurred in by Mr. Justice VINJE, filed in the case of *Milwaukee E. R. & L. Co. v. Railroad Comm.* 153 Wis. 592, 142 N. W. 491, the same learned Justice, for whose ability we entertain the highest regard, gives additional expression to the view that it is only the franchise granting corporate existence that is within the reserved power. In those opinions it was assumed by the learned Justice who wrote them that the distinction between the primary and secondary franchise of a corporation had been overlooked in some of the prior decisions of this court, and suggested that such distinction was pointed out in *State ex rel. Att'y Gen. v. Portage City W. Co.* 107 Wis. 441, 83 N. W. 697; *Linden L. Co. v. Milwaukee E. R. & L. Co.* 107 Wis. 493, 83 N. W. 851; *Pittsburg T. Laboratory v. Milwaukee E. R. & L. Co.* 110 Wis. 633, 86 N. W. 592; *In re Southern Wis. P. Co.* 140 Wis. 245,

122 N. W. 801. It is true that the distinction between the two classes of franchises was referred to in those cases, but not for the purpose of applying the reserved power we are now considering. Questions did arise in those cases which made the distinction between the two classes of franchises germane to the discussion, but in none of them was the reserved power involved or mentioned.

In *State ex rel. Att'y Gen. v. Portage City W. Co.* 107 Wis. 441, 83 N. W. 697, the action was brought by the attorney general to forfeit the waterworks franchise granted by the city of Portage to certain individuals and subsequently assigned by them to the defendant, a foreign corporation. The question was whether the privileges granted by the ordinance constituted a franchise emanating from sovereign authority within the meaning of that term as used in sec. 3466, Wis. Stats. Much is said in the opinion concerning the franchises to be, and other franchises of, a corporation, but not a word is said concerning the reserved power.

In *Pittsburg T. Laboratory v. Milwaukee E. R. & L. Co.* 110 Wis. 633, 86 N. W. 592, the question was whether plaintiff was entitled to a mechanic's lien on a certain power house, the answer to which was held to depend on whether the property was essential to the maintenance and operation of the defendant's system of street railways for which the defendant corporation was established. The reserved power was not involved and was not mentioned.

The question presented in the *Linden Land Company Case, supra,* was this: An ordinance of the city of Milwaukee granted to a street railway company the right to lay its tracks upon certain streets in the city of Milwaukee. The validity of this ordinance was challenged because it granted corporate powers or privileges which, as it was claimed, could be granted only by general law, by reason of sec. 31, art. IV, of the state constitution prohibiting the legislature from enacting any special or private laws for granting corporate powers or privileges except to cities, and sec. 32,

art. IV, requiring the legislature to provide general laws
for the transaction of any business prohibited by sec. 31.
It was there held that sec. 31, art. IV, Const., applied only
to the primary franchise of a corporation, and that all other
franchises or privileges might be granted by special act.

Unless it be kept in mind that secs. 31 and 32 of art. IV
of the constitution were added by amendment adopted in
1871, some confusion is likely to arise in reading the pro-
vision of sec. 31 in conjunction with sec. 1, art. XI, of the
constitution.   Sec. 31 was not in the constitution as origi-
nally adopted.   Sec. 1, art. XI, was the only provision
therein relating to the formation of corporations without
banking powers.   It provided that "corporations without
banking powers or privileges may be formed under general
laws, but shall not be created by special act, except for
municipal purposes, and in cases where, in the judgment of
the legislature, the objects of the corporation cannot be
attained under general laws.   All general laws or special
acts enacted under the provisions of this section may be
altered or repealed by the legislature at any time after their
passage."

The query naturally arises, What was the effect of the
adoption of sec. 31 of art. IV upon the power reserved in
sec. 1 of Art. XI?   That question arose in *Att'y Gen. v.
Railroad Cos.* 35 Wis. 425, decided in 1874, but three years
after the adoption of the amendment.   The identical ques-
tion there presented was whether a charter granted by special
act could, after the adoption of the amendment, be amended
by special act.   The court dwelt upon the purpose of the
amendment.   It was held that the purpose was to make
mandatory the directory provision contained in sec. 1, art.
XI, that corporations should be formed under general laws.
With reference to the effect of the amendment upon the
reserved power the court said:

"We shall not stop to dwell here on the importance of
the reserved power.   We may do that later, in a more appro-

priate connection. We shall only assume here that it is a power of great significance and gravity; of such moment, that it is impossible to believe that the legislature and the people intended to surrender or impair it; very hard to believe that they suffered themselves to surrender or impair it, by implication, in an amendment designed for quite a different purpose, quite consistent with the reserved power."

And there the phrase in the amendment "to grant corporate powers and privileges" was held to mean *"in principio donationis,* and equivalent to the phrase 'to grant corporate charters.' This is implied not only by the word 'grant,' but also by the word 'corporate.' A franchise is not essentially corporate; and it is not the grant of franchise which is prohibited, but of corporate franchise; that is, as we understand it, franchise by act of incorporation." When these excerpts from *Att'y Gen. v. Railroad Cos.* are read in connection with the further extended discussion of the reserved power therein contained, to which we have heretofore adverted, we think there can be no doubt that it was there held that the amendment of 1871 had no effect whatever upon the reserved power, and that its original force and vigor remained unimpaired. The effect of the amendment as well as its purpose was to require the formation of corporations under general laws. Other franchises, such as the right to build dams, construct reservoirs, use public streets, etc., might thereafter as before be bestowed upon them by special act. This was the holding in the *Linden Land Company Case, supra* (107 Wis. 493, 83 N. W. 851), and the reserved power of the constitution was not there mentioned or considered.

*In re Southern Wis. P. Co.* 140 Wis. 245, 122 N. W. 801, involved a question similar to that considered in the *Linden Land Company Case,* and the ruling of the latter case was followed. The reserved power was not in question nor was it discussed.

The case of *La Crosse v. La Crosse G. & E. Co.* 145 Wis.

408, 130 N. W. 530, is also cited by Mr. Justice MARSHALL in his dissenting opinion in *Milwaukee E. R. & L. Co. v. Railroad Comm.* 153 Wis. 592, 142 N. W. 491, and much reliance is placed thereon by the attorney for the respondent here. If there is anything in that case which casts doubt upon the scope of the reserved power as we construe it, it is ambiguous indeed. (The corrective opinion filed by Mr. Justice MARSHALL in the *Calumet Service Company Case,* *supra,* was intended to correct certain mis-impressions which he thought might be given by the language used in that case.) It was said therein, speaking of the franchise of the Gas & Electric Company granted to it by the city of La Crosse:

"The entirety was a state grant and so under legislative control like any other corporate state franchise."

And further:

"Whether mere contractual features, as between the state or any instrumentality used by it in conferring special privilege, and its grantee, inhering in the privilege itself, the franchise not being corporate, are within the reserved power to alter, amend, or repeal under sec. 1, art. XI, of the constitution, need not be discussed for the reason stated. What the plaintiff did, if anything of a contractual nature, since it appertained to the franchise itself, the state did. What the two real parties to the transaction mutually did, obviously, they could mutually undo."

And here is the language upon which counsel for respondent so strongly relies:

"Though we thus leave a subject treated in the briefs of counsel, with passing notice, it is not to be taken as doubting the state of the law on the question. One needs, in respect to it, to distinguish between corporate franchises; in the sense of the right to corporate existence, and corporate franchises, as the term is often, not very accurately used; in the sense of, a privilege owned by a corporation in its proprietary capacity; a thing granted which when accepted is property,—may be acquired or parted with as any other property might, barring special legislative restrictions.

(Citing.)    The distinction has not always been appreciated (citing) ; and remarks with reference thereto in cases cited above and comparison therewith of *Ashland v. Wheeler,* 88 Wis. 607, 60 N. W. 818, and the language of and precise subject dealt with in sec. 1, art. XI, of the constitution."

Whatever was in the mind of the learned Justice who wrote that opinion with reference to the reserved power of the constitution, we would not be justified in seizing upon these cursory and passing remarks as an excuse for overturning or modifying the scope and extent of the reserved power as settled by the long and uniform course of the prior decisions of this court heretofore cited in this opinion.

As stated in *Att'y Gen. v. Railroad Cos., supra,* we regard this power as one of great significance and gravity.    We believe that when it was included in the constitution it was placed there for the purpose of reserving to the people of this state full power and control over corporations of its creation; that the purpose to be accomplished thereby was to reserve to the state those sovereign rights of which the states had been shorn by the decision in the *Dartmouth College Case,* and that any construction which limits the scope of this power to a narrower field amounts to a judicial deprivation of sovereign rights which the people believed they had preserved to themselves by the terms of sec. 1, art. XI, of the constitution.

This construction implies no denial of vested or property rights in valuable privileges granted to a corporation, essentially connected with its franchise and necessary to its business, which conduced to an acceptance of its charter and an organization under it.    Such privileges are property.    But in this state they are not unincumbered property.    They are incumbered with the right of the state to alter or repeal them. The title of the grantee is necessarily a qualified title, because that is the only title the state can give.    The constitutional provision under consideration deprives the legislature·

of the power of granting an unqualified right.   The grantee
takes them subject to this power of the state to alter or
repeal.   The corporation which invests its money in reliance
upon such privileges does so in the faith that the power will
not be unjustly or unreasonably exercised.   And here it may
be said that the power is not one to be used for the purposes
of spoliation or oppression.   It is a power which the state
is permitted to invoke only for the promotion and the pro-
tection of public interests.   That is the purpose for which
it was reserved.   It is not to be used arbitrarily or capri-
ciously or for the purpose of punishment or retaliation.
That has been decided by this court.   *State ex rel. Northern
Pac. R. Co. v. Railroad Comm.* 140 Wis. 145, 121 N. W.
919; *Water Power Cases,* 148 Wis. 124, 134 N. W. 330.
It is an instrument of justice, not a weapon of discipline.

The public utility law was enacted as a remedy for a well-
recognized public evil.   The relations existing between the
respective municipalities and their public utilities were most
unsatisfactory.   The impotency of the municipalities to deal
with them so as to secure adequate and satisfactory service
for reasonable charges was abundantly demonstrated.   The
officers of the municipality lacked the training in the tech-
nique of the public utility business which was essential either
to protect the interests of the citizens or deal justly with the
public utility company.   Whether the relations between the
municipality and the utility company were that of open war
or supine acquiescence on the part of the city to the demands
of the company, mattered little to the consumer.   Unreason-
able demands made by the city as a result of a lack of in-
formation concerning the public utility business were as
fruitless of just results as meek submission to the ultimatums
of the utility.   The situation resulted neither in justice to
the consumer nor stable business conditions to the utility.

So it was determined to take from the municipalities,
which were not equipped to fix standards of service which

might reasonably be demanded under the circumstances and determine reasonable rates therefor, the regulation and control of public utilities and vest that power with the railroad commission, which body, through its staff of experts, could acquire the information necessary to fix and enforce appropriate standards of service and just and reasonable rates which should adequately compensate the utility for the service rendered. The legislation has been welcomed by the public and the public utility companies alike. It has never been suggested that the purpose of the legislation was other than for the promotion of the public interests. That its effect was not to oppress the public-service corporations is abundantly shown by the fact that during the four years (from 1907 to 1911) in which the law was elective, many, if not the great majority, of those corporations voluntarily surrendered their existing franchises and submitted to the provisions of the law. It is believed that fourteen years of experience has vindicated the law as a measure of great public benefit, although recently, when abnormal industrial and commercial conditions have given rise to a general increase in rates of service, mutterings against the law, or its administration, may be heard. But it should not be forgotten that successful regulation must be fearless and fair and accommodated to the exigencies of changing conditions. Whenever the administrative agency appointed to arbitrate between the public and the utility is influenced by public sentiment rather than considerations of justice, the purpose of the law will fail, not because of its infirmities but because of its weak and servile administration. Critics should appreciate that private capital devoted to public service is entitled to a fair return, and that it requires more courage and character to render just than popular decisions.

Conceding that the public interest required it, it was competent for the legislature to repeal the franchises of all public utility corporations. *Greenwood v. Freight Co.* 105

U. S. 13.  This, however, it did not do.  It simply substituted the powers and privileges of the public utility law for those of their existing franchises.  It did not interfere with their right to occupy public streets or to continue in their respective businesses.  The tenure of their respective franchises was made indeterminate instead of fixed and limited.  Their regulation and control was vested with the railroad commission instead of the various municipalities.  Truly this was a reasonable exercise of the reserved power, and was the initial step necessary to work the transition and carry out the legislative scheme.

A new franchise was therefore granted to the defendant in lieu of its original franchise by the enactment of ch. 596, Laws 1911.  Thereafter its franchise was that of the indeterminate permit, and it was subject to the provisions of the public utility law.  This also was its franchise on October 1, 1917, when it is claimed its original franchise expired.  The public utility law had superseded everything of a franchise nature embodied in the original ordinance granted to it by the village of Superior and the subsequent and succeeding amendments thereto.

We now come to the very crux of this controversy.  What is the effect of that law upon the provision found in the original franchise-ordinance providing that "at the expiration of the said thirty years, should the said village refuse to grant to the said Superior Water Works Company, its successors or assigns, the right to continue and maintain said system of waterworks for another term of thirty years, upon the same terms and conditions as may exist *between the said village or city and the said Superior Water Works Company* at the expiration of the first thirty years, . . . then and in such case, the village shall purchase from said Superior Water Works Company, . . . said system of waterworks, and the property connected therewith, at a fair valuation, as provided in sec. 13"?

It is the contention of the respondent *Water Company* that this provision of the ordinance is a contract entered into by the city in its proprietary capacity and that it is not inherent in, not connected with, and forms no part of, the franchise emanating from the state to the *Water Company* for the use of the streets of that city. The city contends that the provision is an inherent and constituent part of the franchise and is subject to be altered or repealed by the legislature. We find it unnecessary to determine which of these contentions is right; because, even though it be considered as a contract, we think it gives rise to no obligation on the part of the city to purchase the plant according to its terms. The manifest purpose of the provision was to assure the *Water Company* one of two things: either a renewal of its franchise for another period of thirty years or a sale of its property in case such franchise be not renewed. The franchise called for was one having "the same terms and conditions as may exist between the said village or city and the said Superior Water Works Company at the expiration of the first thirty years." The franchise which it had at that date was the indeterminate permit. That was either its franchise or it had none. That was a continuing franchise. It was indeterminate as to time. It was not limited to thirty years or any other period. Consequently there was no occasion for the city to "grant to the said Superior Water Works Company, its successors or assigns, the right to continue and maintain said system of waterworks." It already had that right. There was therefore no breach of this part of the alleged contract on the part of the city. Until there was a breach of this provision of the contract, no obligation on the part of the city to purchase according to the terms of the contract arose. It seems plain that the position of the *Water Company* is not helped by construing this provision of the ordinance as a contract made by the city in its proprietary capacity. The conditions precedent to an obligation on the part of the city to buy under the

terms of the contract have not come to pass, and the city has in no manner become obligated to carry out the feature of the contract which is sought to be enforced in this action.

Furthermore, the very law which substituted the indeterminate permit for the original franchise of the *Water Company* authorized the city of *Superior* to acquire the property thereof by eminent domain, and in thus proceeding to acquire it the city is exercising the sovereignty of the state, which was not and could not be bartered away by a municipal ordinance, or in any other manner. It is a familiar rule that all property is held subject to the right of the state to acquire it for public purposes whenever it may see fit to do so. The power of eminent domain is a sovereign power, whether exercised by the state or by an agency to whom it may be delegated. The property of the *Water Company* was at all times subject to this power. The state could take it in pursuance of that power at any time, and likewise it could authorize the city so to take it, and the exercise of the power was in no manner frustrated by the provisions found in the franchise-ordinance or in any of its amendments. The proceedings sought to be enjoined are in effect proceedings by the state to appropriate the property for just compensation, and its right and power so to do has not and cannot be suspended.

The law under which the city is proceeding to acquire the plant assures the *Water Company* adequate compensation for its property. We must assume that that is all that the *Water Company* will secure for its property if valued according to the provisions of the so-called contract. It is not alleged in the complaint that the method of valuation provided for by the public utility law will not afford the *Water Company* just compensation for its property, nor is it alleged that the valuation provided for in the ordinance will afford it more than just compensation. It is not alleged that it will be in any manner damaged if its property be valued in the way provided by the public utility law rather

than in accordance with the terms of the alleged contract. If the method of valuation provided for in the ordinance is productive of unconscionable results and will result in an excessive valuation, then it should be considered whether a court of equity should, in the exercise of its discretion, invoke its power to decree a specific performance of the contract. However, we cannot assume such to be the case. We assume that either method will fix a just valuation upon the property, and that this controversy simply involves the question of which method shall be adopted in arriving at a just valuation of the property which the city seeks to take.

Our conclusion, therefore, is that the complaint states no cause of action and the demurrer thereto should have been sustained.

We may say that we have not been hindered in arriving at our conclusion by that line of cases in the federal supreme court such as *Detroit v. Detroit Citizens' St. R. Co.* 184 U. S. 368, 22 Sup. Ct. 410; *Cleveland v. Cleveland City R. Co.* 194 U. S. 517, 24 Sup. Ct. 756; *Minneapolis v. Minneapolis St. R. Co.* 215 U. S. 417, 30 Sup. Ct. 118, and other cases cited in respondent's brief. In those cases similar ordinances were held to be contracts as between the municipality and the public utility. This is in harmony with our own decisions. *Ashland v. Wheeler,* 88 Wis. 607, 60 N. W. 818. In each of the cases cited the contest was between the municipality and the public utility, and the right of the state to alter or amend the corporate charters was not involved. In the leading case of *Detroit v. Detroit Citizens' R. Co., supra,* this question was specifically laid out of the case at page 397, where it is said: "The legislature has not attempted to interfere with the rights of the street railway companies in Detroit, and hence the extent of its power so to do is not involved in this case." Nor was it involved in *Detroit United Ry. v. Michigan,* 242 U. S. 238, 37 Sup. Ct. 87. In that case it appeared that the legislature

passed an act extending the city limits of the city of Detroit, and the question was whether the street railways operating in the annexed territory could charge rates of fare provided by franchise granted to them by the town government, or whether, after the annexation, the city council of the city of Detroit had power to change the rates of fare prescribed in the original franchise. The court held that the rights of the railway company were fixed by the original franchise-ordinance granted by the town government, and that its rights so fixed could not be impaired by the Michigan act enlarging the limits of the city of Detroit. There was no purpose on the part of the Michigan legislature to alter or amend the charter or franchise of the street railway company. Neither was that power invoked to justify its action. Its effect on the franchise of the street car company was incidental merely, and the question involved was whether, after the annexation, the street car company was subject to the regulation and control of the common council of the city of Detroit.

In concluding this opinion it is proper to say that had a different conclusion been reached upon the questions discussed it would have been necessary to consider whether the alleged contract could have been enforced against the city, in view of the fact that the state had withdrawn from the city the power to grant the franchise. It is a general rule of law that performance of contracts is excused when rendered impossible by act of law. 18 Mich. Law Review, 602, and cases there cited. The legislature had rendered it impossible for the city to renew the franchise for a term of thirty years or for any other term. Having deprived it of the power to grant the franchise, the question of whether its obligation to buy the plant, which obligation is dependent upon its failure to grant the franchise, could be enforced, would require serious consideration. This case is very analogous to *Macon & B. R. Co. v. Gibson,* 85

Ga. 1, 11 S. E. 442, where the performance of a contract was excused upon quite similar considerations.

*By the Court.*—Order reversed, and cause remanded with directions to sustain the demurrer to the complaint.

The respondent moved for a rehearing.

In support of the motion there was a brief by *Charles R. Fridley* of Superior and *H. L. Butler* of Madison, counsel for the *Water Company.*

In opposition thereto there was a brief by *T. L. McIntosh,* attorney, and *Louis Hanitch,* of counsel, both of Superior.

On March 11, 1921, an order was entered granting a rehearing upon the question set forth in the opinion filed May 31, 1921.

For the appellants there was a brief by *T. L. McIntosh,* city attorney, and *Hanitch, Hartley & McPherson* of Superior, attorneys, and oral argument by *Mr. Louis Hanitch* and *Mr. McIntosh.*

*Charles R. Fridley* of Superior and *H. L. Butler* of Madison, counsel for the respondent *Water Company.*

The following opinion was filed May 31, 1921:

OWEN, J.    Upon motion for rehearing, attention was called to the fact that the opinion of the court did not deal with the question whether the city could, by proceedings in the nature of condemnation provided for by the public utility law, acquire that part of the *Water Company's* property located in the state of Minnesota, which issue was tendered by the pleadings though not dwelt upon in the briefs or the oral argument.    Apprehension was expressed on the part of the respondent *Water Company* that the mandate of this court directing that the demurrer to the complaint be sustained amounted to *res adjudicata* upon this question, even though not dealt with in the opinion.    The question thus raised is an important one, which would no doubt eventually call for the decision of this court; and

while it would ordinarily reach this court on appeal from the order of the railroad commission, the court, believing that the interests of the parties would best be promoted by dealing with the question at the present time, to the end that further proceedings on the part of the city to acquire the waterworks plant should take a course in harmony with the view of this court concerning the power of the city to condemn that portion of the plant, an order was entered granting a rehearing upon the following question:

"Upon any proceedings heretofore taken, or upon any proceedings authorized by law, can the city acquire, under the provisions of the public utility law, or under condemnation proceedings, or in any proceedings in the nature thereof, or in any manner, title to that portion of the property of the respondent *Water Company* located in the state of Minnesota?"

In response to that question the *Water Company* contends that the proceedings under which the city is attempting to secure title to the property of the *Water Company* are essentially proceedings in condemnation; that the city is not confining its efforts in such behalf to the taking of so much of the plant of the *Water Company* as is physically located in the state of Wisconsin, but that they extend to and include as well that portion of the plant physically located in the state of Minnesota; that the jurisdiction of this state to condemn property and thereby work a transition of title from the *Water Company* to the city does not extend to property located in the state of Minnesota, and that the city should be enjoined from any further efforts to secure title to that part of the plant having its physical location in the state of Minnesota, because of such lack of jurisdiction or power on the part of this state.

In the first place, it may as well be conceded that the proceedings under which the city is attempting to acquire title to the waterworks plant are condemnation proceedings. Although the public utility law (sec. 1797*m*—78, Stats.)

provides that any public utility voluntarily accepting an
indeterminate permit shall be deemed to have consented
to a future purchase of its property by the municipality in
which the major part of it is situate for the compensation
and under the terms and conditions determined by the
commission, and shall thereby be deemed to have waived the
right of requiring the necessity of such taking to be es-
tablished by the verdict of a jury, and to have waived all
other remedies and rights relative to condemnation, and by
sub. 4, sec. 1797m—79, Stats., it is provided that any
municipality shall have the power, subject to the provisions
of the public utility law, to acquire by purchase, as provided
in the public utility law, the property of any public utility
actually used and useful for the convenience of the public
operating under any indeterminate permit, it was held in
*Connell v. Kaukauna,* 164 Wis. 471, 159 N. W. 927, 160
N. W. 1035, that proceedings on the part of a municipality
to acquire the property of a waterworks company under
the provisions of the law just referred to were in the nature
of condemnation proceedings.   There is much greater
reason for saying, and in fact there seems to be little room
to doubt, that proceedings on the part of a municipality to
acquire the property of a public utility company which has
not voluntarily subjected itself to the provisions of the
public utility act are in the nature of condemnation proceed-
ings.   In view of the ruling made in the *Kaukauna Case*
that such proceedings are in the nature of condemnation
proceedings even where the public utility has voluntarily
accepted an indeterminate permit, it would seem unnecessary
to devote either time or space to demonstrate that the pro-
ceedings here in question are in fact in the nature of condem-
nation proceedings.   Neither does there seem to be any
room to doubt that this state is without any jurisdiction
or authority to condemn property beyond its borders and
over which it exercises no jurisdiction whatever.

The question with which we are confronted is whether that part of the water plant which reaches across the state line into the waters of Lake Superior, from which the supply of water is pumped for the use of the city, is in fact Wisconsin·property. We freely concede at the outset that that question must be answered in the affirmative in order to enable the city to proceed to continue the proceedings now instituted to a successful termination, and that unless the question may be so answered the demurrer to the complaint should be overruled.

And right here perhaps a word descriptive of the plant is appropriate, if not necessary, to a thorough understanding of what follows. The city of *Superior* is located at the mouth of the St. Louis river, at which place the river widens out and has more the appearance and characteristics of a bay than a river. This bay is commonly known as the Bay of Superior and is about a mile in width. The opposite shore of this bay is formed by a narrow strip of land called Minnesota Point, and is a part of the state of Minnesota. In order to secure a supply of pure water from Lake Superior, the *Water Company,* pursuant to an agreement referred to in the main opinion, extended a main across the Bay of Superior and across Minnesota Point, which is perhaps from forty to sixty rods in width, and on out into the lake a sufficient distance to enable it to secure pure and wholesome water. It is that portion of this intake pipe, so called, which extends beyond the boundary line between Wisconsin and Minnesota and across Minnesota Point into Lake Superior that is referred to as that portion of the plant lying in the state of Minnesota.

From this it will be seen that while this intake pipe is a very essential, it is, comparatively speaking, a small, proportion of the entire· property of the *Water Company.* It is, however, an integral part of the plant and inseparable therefrom; that is to say, its existence was deemed essential

by both the *Water Company* and the city to enable the former to fulfil the obligation imposed upon it by its franchise of furnishing pure and wholesome water to the inhabitants of the city; that it always has been considered, and in fact is, an essential and integral part of the plant, is beyond doubt. A severance of this intake pipe from the plant at the boundary line of the state would make junk of the pipe lying beyond, and necessitate some other expensive arrangement on the part of the company to procure a supply of wholesome water for the city.

The *Water Company* is a corporation organized under the laws of the state of Wisconsin. It has a franchise to operate a waterworks plant in the city of *Superior* derived from the state of Wisconsin. Every part and parcel of the property sought to be acquired by the city in the proceedings complained of is property devoted by the *Water Company* to the fulfilment of the duties laid upon it by its franchise. It is settled in this state that the franchise of a public utility corporation and the property devoted by it to the performance of the duties imposed upon it by the franchise constitute an entirety, and the property, neither in its entirety nor in parcels, can be separated from the franchise, and that as the franchise is deemed the principal thing and is an incorporeal hereditament, the entire property assumes the character of personalty. *Yellow River Imp. Co. v. Wood Co.* 81 Wis. 554, 51 N. W. 1004; *Chapman V. M. Co. v. Oconto W. Co.* 89 Wis. 264, 60 N. W. 1004; *Fond du Lac W. Co. v. Fond du Lac,* 82 Wis. 322, 52 N. W. 439; *State ex rel. Milwaukee St. R. Co. v. Anderson,* 90 Wis. 550, 63 N. W. 746; *Washburn v. Washburn W. W. Co.* 120 Wis. 575, 98 N. W. 539; *Chicago & N. W. R. Co. v. State,* 128 Wis. 553, 108 N. W. 557. In the latter case this principle was phrased in this way:

"This court has held that the franchise is the principal, the visible things the minor, part of an organized business

machine, in a corporate organization, though the franchise is seen only through the physical part and its use; that the intangible part is personal property and draws to it, and so impresses the physical thing with its own character as to give to the whole the character of personalty."

It thus will be seen that the water plant is an entirety inseparable and indivisible. Its principal location is in this state. It is owned by a corporation chartered in this state. It is devoted to a public use in this state, and to enable the corporation to discharge the duties assumed by it when it accepted its franchise granted by this state. It is assessed for purposes of taxation as an entirety under the laws of this state. Its value·as an entirety is taken as a basis for rate-making purposes under the law of this state. It is difficult to conceive of property more clearly and definitely subjected to the jurisdiction of this state. Although a portion of it may be physically located beyond the borders of this state, nevertheless, it being deemed personal property, it has a legal situs in this state; and this is as true of any real estate or interest therein that the company may own to enable it to lay its pipe across Minnesota Point as it is with reference to any other part of the plant.

This state, therefore, has ample jurisdiction to deal with the entire property as property within this state and to take the title from the *Water Company* pursuant to its power of eminent domain. Should there be any difficulty in vesting the city with title to real estate on Minnesota Point, a court of equity has ample power to compel a conveyance on the part of the *Water Company*, which it would not hestitate to exercise in order to effectuate legislation enabling municipalities to acquire title to the public utilities rendering public service to and within such municipalities. It is well settled in this country that a court of one state may decree the foreclosure of a mortgage on property lying partly within the state of its jurisdiction and partly in another

state, and direct a deed to the purchasers. *Muller v. Dows,* 94 U. S. 444, 24 Lawy. Ed. 207. See, also, note on jurisdiction of equity over suits affecting real property in another state or country in 69 L. R. A. 673. While in such cases the decree is based on the principle that a court of equity having jurisdiction of the person may decree a conveyance by him of land in another state, and may enforce the decree by process, no reason is perceived why the same principle should not apply in a situation such as this. A court of equity of this state may acquire jurisdiction over the public utility. Should it be thought that some contractual relation between the state and the utility is necessary to justify the action, as of course is present in case of a mortgage foreclosure, that readily may be found in the franchise granted by the state to the public utility, which in this case was amended pursuant to the reserved power of the legislature. The franchise of the *Water Company,* which enables it to pursue its business of supplying water to the city of *Superior* and its inhabitants, is a contract between it and the state. As amended by the legislature pursuant to the reserved power, that contract provides that its property may be acquired in the manner here attempted, and, if necessary to carry out the legislative scheme, a court of equity should not hesitate to compel the utility to execute conveyances to property the title to which cannot be affected by the condemnation proceedings outlined in the public utility law.

This view makes it unnecessary to consider many other objections made to the proceedings in the brief of the appellant *Water Company.*

It is contended that the proceeding is barred by numerous provisions of the federal constitution, such as art. I, sec. 10, prohibiting any state from passing laws impairing the obligations of contract, and the Fourteenth amendment, prohibiting a state from denying to any person within its jurisdiction the equal protection of the law, and that it

constitutes an unlawful interference with interstate commerce. We feel that so far as these objections merit attention they are answered in what already has been said.

The question of the power of the city to acquire and own property beyond the state as well as city boundaries is considered in the briefs, though such power is not seriously doubted. In fact the *Water Company* not only concedes but successfully contends that the city has such power. We think there can be no doubt of it. The city is authorized not only by its charter but by the public utility law to acquire, own, and operate a waterworks plant. If the only available or practicable supply of pure and wholesome water for a boundary-line city lies across the state boundary, the power granted generally to municipalities of this state to own and operate waterworks plants would be denied to our boundary-line cities if they could not extend pipes and mains across the boundary line to such available water supply. That a city may acquire and own property, including real estate, beyond its borders to enable it to perform its municipal functions or powers expressly conferred upon it, was settled in this state by the case of *Schneider v. Menasha,* 118 Wis. 298, 95 N. W. 94, following the decided current of authority in this country, as will fully appear by the perusal of the opinion therein. The case of *Becker v. La Crosse,* 99 Wis. 414, 75 N. W. 84, involved an exercise on the part of the city of La Crosse of governmental functions in the state of Minnesota, the authority to do which was of course denied. The exercise of municipal functions on the part of a municipality beyond its boundaries is an entirely different matter from the owning of real estate in its proprietary capacity so far as it may be necessary or convenient for the discharge of municipal powers and functions. Neither the law nor public policy of this state interferes with the acquirement by the city of *Superior* of that portion of the waterworks plant reaching beyond the boundary line of this state.

Should the laws of the state of Minnesota deprive a foreign municipality of the right to acquire or own property, either real or personal, in the state of Minnesota, a further question would be presented.    However, there is nothing before us to indicate that the city of *Superior* may not acquire and own any portion of this plant physically located in the state of Minnesota under the laws of that state.

Upon this consideration of the further issue raised upon the motion for a rehearing we arrive at the conclusion that the demurrer to the complaint should have been sustained, and the mandate entered herein is correct.

ROSENBERRY, J., dissents on rehearing.

JONES, J., took no part.